# SUPREME COURT.

THE PEOPLE *ex rel.* THE BUFFALO AND STATE LINE RAILROAD
COMPANY agt. PETER FRDERICKS and other assessors, and
GEORGE M. PIERCE, supervisor of the town of Hamburg.

When assessors, in their return to a writ of certiorari, state that they had per-
fected the assessment roll and delivered the same, duly certified, to the super-
visor of the town, and that the same was not in their possession or control at
the time the writ was served on them, the court will dismiss the writ as to
them.

The only questions the court can consider upon certiorari brought to review an
assessment under the general tax law, are whether the assessors had jurisdic-
tion to assess the relator, and have kept their proceedings within the bounds
of such jurisdiction.

Assessors are not bound to reduce the value of the property of any party deeming
himself aggrieved by their assessment to the amount fixed in his sworn state-
ment and examination before them, but they are to fix the value, after such
statement is before them, as they may deem just, having in view the general
duty to assess property "at its full and true value, as they would appraise the
"same in payment of a just debt due from a solvent debtor."

The real estate of railroad companies should be assessed at its value for the pur-
pose to which it has been adapted, and not as mere farming lands ; and in esti-
mating the same, the assessors are not bound to consider it as mere land and
superstructure isolated in their town from the other parts of the road. They
are entitled to estimate the value of that part of the real estate within their
jurisdiction which contributes to make up a complete and useful railroad
extending beyond the town they represent. What may be properly considered
in estimating that value discussed.

A railroad corporation should be regarded as a resident of the several towns and
wards through which its road extends, within the meaning of the tax laws, and
assessed therein for its real estate the same as taxable inhabitants are assessed
for their real estate situated therein. The real estate of railroad companies,
which is used and occupied by them for railroad purposes, is not required to be
assessed as "non-resident lands."

*Eighth District General Term, November,* 1866.

*Before* RICHARD P. MARVIN, NOAH DAVIS *and* CHARLES
DANIELS, *Justices.*

CERTIORARI to review the assessment of the real estate of
the relator, situate in the town of Hamburg.

The relator is a corporation, organized under the laws of
the state, to construct and operate a railroad between the
city of Buffalo and the western line of this state, along the
shore of Lake Erie. Its road extends and is operated

through the town of Hamburg, a distance of 9 29-100 miles. The assessors of that town entered the real estate of the relator on the assessment roll as follows: In the first column, "Buffalo and State Line Railroad Company;" in the second column, "Extent of road in the town of Hamburg 9 29-100 miles; amount of real estate in said town belonging to said company is eighty-two and seventy-eight-hundredths acres—being a strip of land about four rods in width, extending through said town in a curved line, and occupied by said company for a railroad, including superstructures and fixtures thereon, 82 78-100 acres." In the third column, as the value of the real estate, $265,000. On the 21st of August, at the time fixed for the correction of the roll, the vice president of the company, with the counsel of said company, appeared before said assessors and applied to have the valuation of the real estate reduced; and the vice president was examined on oath touching the value of said real estate, and his examination was reduced to writing and forms part of the return to the writ. On such examination, he stated the value of the land at not to exceed $40 per acre, or $3,311.20; the buildings and water pipes, $1,600; the superstructure, which includes ties, chairs, rails, spikes, frogs and switches, as at present constructed, not to exceed $63,756.50.

On his cross-examination he stated that he did not know what the cost of constructing the road was per mile; that his estimates did not include the cost of costruction, such as grading, laying ties, rails, &c.; that the cost of laying rails and iron would amount to about $250 a mile; the cost of grading, fifteen to twenty-five cents a yard for earth, and from thirty-five to seventy-five cents per cubic yard for rock; that he had no means of estimating the number of yards of grading; that the last quotations of the stock of the road was 180 or 190; that he did not include in his estimate the value of the material used in cattle guards and bridges, and did not know its value; that the material used in them was principally stone, except of the bridge over the stream that divides the town of Hamburg from Evans, the cost of

which he did not know; that there were several culverts in the town built of stone, and that he did not know the amount or value of the stone put into culverts; that, if the road were put up and sold as a whole, its price would depend on the value of the stock; if that part in Hamburg were sold by itself, the land he thought would not bring to exceed $40 an acre; that he did not know the original cost of the road per mile, nor the aggregate cost in the town of Hamburg, nor the original cost of the land on which the road runs.

The return also sets forth a statement made by the company and verified by the oath of George Palmer, president, filed with the assessors of said town in June, 1853, and yet remaining on file in the town clerk's office, in which, amongst other things, the cost of the real estate of said company in the town of Hamburg is stated at $293,977.

The assessors return that no other examination or evidence was presented or offered to them, or taken by them, on the application to reduce such valuation, and that on the 25th day of August they fixed the value of the real estate at $225,000, having reduced the same $40,000 from the first assessment, and that they made and indorsed their decision as required by statute, upon the written examination of the vice president, and filed the same.

They further return that they estimated and assessed the said real estate of the company at its full and true value, as they would appraise the same in payment of a just debt from a solvent debtor.

That the company, during the year 1866, actually occupied said real estate for the purposes of a railroad, over which frequent trains of cars were passing, and on which were situate tanks, station houses and ticket office, occupied by the agent and employees of said company.

That the real estate of relator is not set down in the assessment roll in a part separate from other assessments. The roll was duly sworn to and delivered to the supervisor, with the statutory oath indorsed, on the 25th day of August. The supervisor returns that he received it on that day, and that it remains with him in the same form as when delivered.

The case was brought to a hearing upon the writ and return.

JOHN GANSON, *for the relator.*
P. G. PARKER *and* GEO. B. HIBBARD, *for defendants.*

DAVIS, J.　The writ in this case appears to have been allowed on the 28th day of August, and served on the assessors on the 31st of the same month.　On the 25th of August the assessors perfected the assessment roll and delivered it to the supervisor of the town.　Thenceforth they had no power or control over it.　For this reason the writ should be quashed as to the assessors.　(*The People* agt. *Supervisors of Alleghany,* 15 *Wend.* 198 ; *Same* agt. *The Mayor of New York,* 2 *Hill,* 9 , *Same* agt. *Supervisors of Queens Co.* 1 *Hill,* 195 ; *Same* agt. *Reddy,* 43 *Barb.* 539.)

Assuming that the writ is well brought against the supervisor, the only questions this court can consider upon this certiorari are, whether the assessors had jurisdiction to assess the relator, and have kept their proceedings within the bounds of such jurisdiction.　(*The People* agt. *The Mayor of New York,* 2 *Hill,* 9 ; *Matter of Mount Morris,* 2 *Hill,* 14 ; *Benton* agt. *Brooklyn,* 2 *Wend.* 395 ; *Starr* agt. *Rochester,* 6 *Wend.* 564 ; *Ex parte Mayor of Albany,* 23 *Wend.* 395 ; *The People* agt. *Van Alstyne,* 32 *Barb.* 131 ; *Same* agt. *Goodwin,* 40 *Barb.* 626; 5 *N. Y.* 568.)

So far as relates to the amount of the assessment, the sole question is, were the assessors bound to take the testimony of the vice president of the company, and the valuation given by him, as conclusively determining the sum at which the relator should have been assessed?　The duty of these officers in making assessments is very plainly declared by statute.　Except where "*they are specially required by law to observe a different rule,*" it is enacted that "all real and personal estate liable to taxation shall be estimated and assessed by the assessors at its full and true value, as they would appraise the same in payment of a just debt due from a solvent debtor." (1 *R. S.* 393, § 17, *as amended by ch.* 176, § 3 ; § 15, 5*th ed. R. S. p.* 911.)

All real estate within this state, unless expressly exempted, "whether owned by individuals or corporations," is liable to taxation (1 *R. S.* 387, § 1), and the real estate of incorporated companies is to be assessed "in the same manner as the real estate of individuals" (1 *R. S.* 389, § 6). The term "real estate," as used in these statutes, is expressly defined "to include the land itself, all buildings and other articles erected upon or affixed to the same, all trees and underwood growing thereon, and all mines, minerals, quarries and fossils in and under the same, except mines belonging to the state" (1 *R. S.* 387, § 3). By subsequent provision of the statute, any person conceiving himself aggrieved by his assessment may apply to the assessors "to reduce the value of his real and personal estate as set down in the assessment roll," and it is made the duty of the assessors to examine the applicant on oath touching the value of such real or personal estate, and after such examination and such other supplementary evidence, under oath, as shall be presented by the aggrieved party, they are required to *"fix the value thereof at such sum as they may deem just under the rule prescribed"* by the section of the Revised Statutes first above quoted. But if the applicant "shall refuse to answer any question as to the value of his real or personal estate, or the amount thereof, or present sufficient supplementary evidence, under oath, to justify a reduction, said assessor shall not reduce the value of such real or personal estate." And in case the assessors fix a valuation greater than the sum sworn to by the applicant, it is made their duty to indorse on the examination their "disagreement" in a prescribed form, and file the same with the clerk of the town, and furnish the applicant with a copy thereof. (1 *R. S.* 5th ed. 912, § 21; *Laws of* 1851, *ch.* 176, § 6; *Laws of* 1857, *ch.* 536, § 5.)

It is very clear to my mind that, under these provisions, the assessors still retain their judicial character, and are subjected to no arbitrary rule, by force of. the examination of the applicant. On the contrary, they are expressly enjoined, after such examination is before them, to fix the value as *they may deem just*, having in view the general duty

to assess property " at its full and true value, as they would appraise the same in payment of a just debt due from a solvent debtor."

But, however this may be, it is apparent that the applicant in this case did not, by his examination, present any such sworn valuation of the property to be assessed as subjected the assessors to any obligation to substitute his estimate for their own. The property, it is to be borne in mind, was fixed and definite in its character and description, and in these respects was not subject to be changed by the oath of any one. It was before the assessors for personal and visual examination, and they were bound to see and know its identity and nature, as well as to listen to the sworn appraisal of the applicant. The examination of the vice president gave no appropriate basis upon which the assessors were at liberty to act. It first reduced the 9 22-100 miles of railroad to the number of acres therein (82 78-100 acres), and then assumed to assess them as farming lands at $40 an acre. It then appraised the buildings and water pipes, and then what is technically called " the superstructure," to wit: " the ties, chairs, rails, spikes, frogs and switches; and there stopped, upon the assumption that the assessors were bound by this partial dissection, and had no right to study the anatomy of railroads for themselves. On his cross-examination he acknowledged that his estimate included nothing for the construction of the road, the laying of the rails, grading, &c., and that he had made no estimate of the quantity of the grading in that town; that he included nothing for cattle guards or bridges, or the value of the material in them; nothing for the culverts and the material in them; and the estimate itself shows that he made no allowance for the nearly twenty miles of fences, unless, indeed, they are included in the valuation of the land. In short, the applicant assumed that he was at liberty to control the assessment by severing the buildings and water pipes, and what is called the superstructure, from the railroad, and resolving the residue into so many acres of farming lands, to be assessed as an ordinary farm. This was a great mis-

take, and it is not suprising that the assessors were able to see it. These officers are generally chosen for their practical good sense, and are apt to look at things *as they are*, and to disregard fanciful distinctions gotten up to make things appear to be what they are not, for the purpose of reducing their value. They were not called upon to assess a farm, but some nine miles of railroad, completed and operated as a railroad; and the question was, what is the fair value, under the statute rule, of this real estate thus made into a complete and useful railroad? To sever, for the purpose of assessment, the buildings and superstructure, and call the residue farming lands, would be a gross absurdity. A farm four rods wide and nine miles long, intersected with public highways, cut up with cattle guards, culverts and bridges, divided lengthwise by a graded embankment, with ditches on either hand occupying a large share of its width, would be a poor investment, either for cultivating or grazing purposes; and no assessor would be justified in appraising it at $40 an acre because the adjoining farms, which were useful as such, were of that value.

The law, as well as good sense, required that the assessors should regard this property precisely what it was, and judge of its value accordingly. If they adopted any such subdivision of parts as that presented by the applicant, it would then be their duty, after estimating the buildings and superstructure, to inquire as to the value of that portion of the railroad lying in their town, considering its embankments, ditches, bridges, culverts, cattle-guards, cuttings, in short, everything that made it what it was; and determine its value in the condition to which these constituent parts of a railroad had brought it. As part of the data from which to judge of value, they were entitled to consider the cost of the real estate of the road, and the productiveness of its use; for while these are not the standard of value, they are elements through which the standard may be ascertained. In estimating a block of buildings, it would be strange indeed, if assessors might not take into consideration its cost, and the amount of rent actually netted from it; and while these

facts would not necessarily control, they certainly should influence their judgments. The company had filed with former assessors a sworn statement, showing that their real estate in the town of Hamburgh cost $293,977.00. I think this statement was properly before the assessors, and might justly be considered by them for the purpose above suggested. I have no question, also, that in estimating the value of that portion of the railroad in their town, they were not bound to consider it as an isolated parcel of the company's road, terminating at the boundaries of their town, and having no connections beyond. They were entitled to look upon it as it is, a portion of a completed railroad, with its appropriate termini, and to ascertain the value of so much of the " Buffalo and State Line Railroad," as lies in their town, limiting their consideration of it only to the value of that part of the real estate within their jurisdiction, which contributes to make up the entire thing, stretching in both directions beyond them. A railroad whose termini were the town lines of Hamburgh, would be worth little or nothing. Its just valuation would be small, because its use would be trifling. But it is another thing when the railroad through that town has no such termini, and is greatly valuable for that very reason. A flouring mill situated in one town, which conducts its waters through an artificial race from a pond situated in another town, is not to be assessed as though it were a mill without a pond, and, therefore, of little value. Nor if a town line cut in half a valuable store, could the owner claim that each town should assess its part as the half of a store which had no other half. Each part would be properly assessable as the half of a whole store ; and for the same reason the relator's railroad in Hamburgh is to be assessed as part of a whole railroad. And the fact that the whole is a valuable and productive property, reflects upon the value of the parts, not to equalize their value by making each mile equally valuable with every other, as was claimed in the *Albany and Schenectady Railroad Company* agt. *Osborn* (12 *Barb*. 223) ; but to enable the assessors of each town to judge how valuable the portion in their town is, considered

as an essential part of a valuable whole. I think if the relator's road were not worth half its cost, and had never paid its running expenses, there would be little difficulty in convincing the assessors of every town that that fact should be considered as affecting the assessment of the portion lying in the several towns.

I am not able to see any reason for saying that the assessors in this case had not jurisdiction to fix the amount, beyond the partial estimates of the vice president. Nor if his estimates of value had covered the entire property, do I see any ground upon which this court could interfere to control the right of the assessors to exercise their own judgment in appraising the real estate, in accordance with the established rules of valuation. A specific thing was to be appraised, and not something indefinite and not certainly known to the assessors. No amount of testimony could change the character or extent of the property, and hence the estimate of the applicant could at most be but his opinion of values, or furnish data upon which other opinions could be formed. A different rule as to *personal assessments* was thought to prevail in *The People* agt. *Reddy* (43 *Barb.* 539), but that was a case where the party testified that he *had not* the amount of personal property for which he was assessed, and claimed certain deductions from the amount he swore he had. If the assessment had been upon $10,000, and the applicant had exhibited $10,000 in greenbacks, but had sworn they were worth but $5,000, I fancy the law would allow the assessors to exercise their own judgment, and that in principle would be analogous to a case where an applicant undertakes to correct his assessment by swearing that a parcel of real estate, the quantity and character of which is not disputed, is worth less than the assessors' estimate. The only effect of such an oath is to set in motion again the judgment of the assessors, in order to reach a "*just value*" under the statutory rule.

But it is claimed that the assessors had no jurisdiction to assess the relator *in personam* for its real estate, but should have entered the same on the roll as non-resident lands. No

such question was raised before the assessors. On the contrary, the company appeared by its vice president and counsel, and substantially conceded that the assessment was correct in form, but erroneous in principle. It is manifest if this point had then been taken, that the assessors could readily have corrected the roll in accordance with the suggestions or request of the relator. Under such circumstances, I doubt if this court ought to entertain the point now made, in a proceeding where the exercise of its authority is purely discretionary, and where, if not *estopped* by its own conduct, the relator has another remedy, if the point be well taken. The question whether the lands of a railroad corporation can be assessed in the several counties through which the road runs, against the corporation itself, or only as non-resident lands, is one by no means free from doubt, under the statutes. But for more than twenty years the law has received a practical construction by a probably invariable usage, that ought not to be interfered with. The serious consequences that would result by subjecting assessors and boards of supervisors to innumerable suits, if it were to be held that the assessments of the companies in such cases were made without jurisdiction, are properly to be considered. The railroad companies have acquiesed in this form of assessment, and it is manifest that it is greatly more advantageous to them than to have the portions of their roads in the several towns of the state set down and returned as non-resident lands, thus subjecting them to numerous dangers and embarrassments. The nature of their property is such as to show that the legislature never had it in contemplation, in providing for the assessment of non-resident lands, but aimed to reach property of a character entirely different from that of a continuous line of railroad owned and operated by an incorporated company. This idea will not fail to strike every one who reads the provisions of the statute relating to the assessment of the lands of non-residents. (1 *R. S.* 391, §§ 11, 14; *5th ed. vol.* 1, 390, §§ 11, 14.) These sections speak of *tracts of land subdivided into lots, and tracts not subdivi led into lots;* concerning which they

give directions and make provisions, which seem quite inapplicable to a railroad track. They evidently had in view the vast tracts of wild land situated in different parts of the state, when the law was enacted, which was prior to the construction of any railroad in our state. The statute on the subject of the place in which property is to be assessed, is as follows:

§ 1. Every person shall be assessed in the town or ward where he resides, when the assessment is made for all lands then owned by him within such town or ward, and occupied by him, or wholly unoccupied.

§ 2. Land occupied by a person other than the owner, may be assessed to the owner or occupant, or as non-resident lands.

§ 3. Unoccupied lands, not owned by a person residing in the ward or town where the same are situated, shall be denominated "lands of non-residents," and shall be assessed as hereinafter provided.

§ 6. The real estate of all incorporated companies liable to taxation, shall be assessed in the town or ward in which the same shall lie, in the same manner as the real estate of individuals. All the personal estate of every incorporated company liable to taxation on its capital, shall be assessed in the town or ward where the principal office or place for transacting the financial concerns of the company shall be. * * *

Although these sections do not specifically provide for the assessment of lands *actually occupied by the owner, who is not a resident of the town or ward where the same are situated,* yet it has been held that they should be construed to carry that class of lands into the class of "lands of nonresidents," as defined by the third section. It is not material, I think, to show that this construction is erroneous. It is enough to show that all lands are to be assessed, and that the form of entering them in the assessment roll has been properly pursued in this case. The provisions directing the assessors how to prepare the assessment roll in respect to taxable inhabitants, and in respect to lands of non-residents,

are found in article 2, of title 2, of part 1, chapter 13 of the Revised Statutes.   (1 *R. S.* 390.)

But the provisions directing the same thing in respect to incorporations, are found in title 4 of the same chapter.   (1 *R. S.* 414.)   That these provisions are general, is seen by the head note of the chapter:   " Regulations concerning the assessment of taxes on incorporated companies."   The sixth section of this title declares that " the assessors shall enter all incorporated companies from which such statements (referring to statements required in preceding sections to be served in towns where the capital is assessable), and the property of each company, and the property of all other incorporated companies *liable to taxation in their respective towns*, in the assessment rolls, in the following manner :   In the first column the name of the incorporation ; in the second column the quantity of real estate owned by such company, and situated within their town or ward ; and in the third column the actual value thereof, estimated as in other cases."

This section will bear the construction that it is *the property liable to taxation*, of all incorporated companies, that the assessors are required to enter in the assessment roll in the form directed by the section.   And upon that construction, railroad companies have everywhere been assessed *in personam*, upon the portions of their roads lying in the several towns.

This view was taken as early as 1834, by the chancellor, in *The Mohawk and Hudson R. R. Co.* agt. *Clute* (4 *Paige*, 384).   After collating the several sections above referred to, he says :   " When this chapter of the Revised Statutes was passed, and when it went into effect, on the first of January, 1828, no railway had been constructed in this state, and only one charter had been granted.   It is not surprising, therefore, that no special provision in relation to such companies should be found in the tax laws.   They must be governed by the general provisions relative to the taxation of the real and personal estates of corporations.

" Taking the several provisions to which I have above

referred, together, I think it is evident that such companies whose stock, or the principal part thereof, is vested in the land necessary for their road, and in their railways and other fixtures connected therewith, are taxable on that portion of their capital as real estate, in the several towns or wards in which such real estate is situated. * * * This is unquestionably the most equitable mode of taxing such property, as it gives to each town and ward through which the railway runs, its fair proportion of the tax imposed upon the property of the company."

In the *Albany and Schenectady R. R. Co.* agt. *Osburne* (12 *Barb.* 223), the supreme court seems to have adopted the same view as to the construction of this statute.

In the mass of litigation in this state that has grown out of the taxation of railroads, it is apparent from all the reported cases I have seen, except one, that the assessment has been made upon the company for its road, and not upon the road as non-resident lands ; and in none of them has the question been suggested that the form of the assessment was not proper. In the single case above referred to (*The New York and Harlem R. R. Co.* agt. *Lyon,* 16 *Barb.* 651), " the land was assessed as the property of non-residents," and the court at special term, held the collector liable to an action, for seizing the property of the company, although the company was also named in the assessment. The learned judge in his opinion, referred to no authorities, and his attention seems not to have been called to the provisions of the statute relative to the assessment of corporations.

The amendment to this chapter, passed in 1857, obviously proceeded upon the idea that the assessment should be made upon the company, and not upon the road as non-resident lands. One section required a personal call by the collector " upon the treasurer of the corporation, or the agent of the nearest station," for the taxes, a thing which there would be no occasion to do if the assessment was simply of non-resident lands. Some of the provisions of these amendments were afterwards repealed, but they have left an illustrative odor behind them. Even if erroneous, a construction sc

long acted upon and acquiesced in, ought to be considered as sanctioned and sanctified by time.

But I am strongly inclined to think that a railroad company should be considered as a resident of the several towns through which its road extends, within the meaning of our tax laws. To most corporations a fixed locality is given by their charters as the place of their business operations. This locality they cannot change without the consent of the legislature, and it becomes the legal residence of the corporation. But a different rule prevails with railroads. They are organized for the purpose of constructing a road between specified places, and to conduct their business along such road through its whole extent. They own and occupy the entire road, and in every town thereof through which it passes, they have and use all the characteristics of inhabitancy that can attach to a corporation. The *locality* of the corporation may in such case justly be said to cover the route of which the company has the constant and potential occupancy and use, and to be everywhere co-extensive with the road itself. If it have a *principal office or place* for transacting the financial concerns of the company, the statute has expressly provided that that shall be the place where its personal property or capital shall be assessed; but without this express enactment the personal property might be assessed in each town where it was owned and used. It is claimed that the locality of the principal office determines for all purposes the legal residence of the corporation. But this does not necesserily follow, because with railroad companies the principal office may be changed at pleasure or convenience, to any point along the route. Indeed, there is nothing in law to prevent the company from having its principal office in a railroad car, and running it up and down the track, as the exigencies of business may require. The principal office does not, therefore, give *locality to the corporation,* in the sense in which it does to a purely local company. It simply for convenience sake, determines where the capital is to be taxed, but leaves the imaginary being which the law has created, to inhabit the whole road it has constructed and

owns, and which is the sphere of its corporate powers. The corporation cannot do what it was created to perform, without being in a legal sense omnipresent along its entire road; and so there is no more legal difficulty in saying that its residence is co-extensive with the road, than that the resi-- dence of a banking corporation is where its operations are by law required to be carried on. (*Sherwood* agt. *Saratoga R. R. Co.* 15 *Barb.* 650; *The People* agt. *Pierce*, 31 *Barb.* 138; *Belden* agt. *New York and Harlem R. R. Co.* 15 *How.* 17.)

In commenting upon section 6, 1 R. S., 389, in *Oswego Starch Company* agt. *Dolloway* (21 *N. Y.* 452), that eminent and able jurist, Chief Justice DENIO, says: " The greater number of these corporations were incorporated for carrying on some financial or industrial enterprise, in some particular city or town, and this circumstance of their locality was a part of their legal constitution; but a great many were of a character which did not permit them to be confined to any one local division of the state. Navigation companies, turn-pike companies and canal companies were of this class, * * * and some others, whose business was of a general nature. In the aggregate, these corporations unattached to any particular town or city, were very numerous. Without some special provision to meet the case, it would be impossible to determine in what place they were to be assessed on their capital, but as all property of joint stock corporations was to be taxed somewhere, there would be great uncertainty as to the place of taxation in such cases, and they might be assessed in the several towns or cities through which their operations extended, and this would be likely to produce a conflict among the different jurisdictions, and to cause much inconvenience to the companies as well as to the public."

For this well expressed reason, the limitation of personal taxation was enacted; but no such reason could apply to the real estate of corporations, and that was, therefore, left to be taxed in each town where it is situated.

And it seems to me no stretch of the law to say that a corporation like the relator, in which the circumstance of

locality can be no part of its legal constitution, except as it is identical with the sphere of its operations, can lawfully be said to reside in or inhabit every town where its road lies or is operated, so far at least as "residence" is essential to the form in which its real estate is to be taxed. I am aware that a very able judge of the superior court of Buffalo, has come to a contrary conclusion upon this question, and the respect to which his opinion is justly entitled, makes me distrustful of my own. The question is by no means a clear one, and it is of so important a character that further and immediate legislation ought to remove all doubt.

I think, however, that it is our duty to affirm the proceedings in the case before us, upon all the questions herein discussed.

STATE OF NEW YORK, COMPTROLLER'S OFFICE, }
ALBANY, *May* 23*d*, 1867. }

CHARLES W. PIKE, ESQ., *Assessor, Evans, Erie Co., N. Y.:*

DEAR SIR :—Your favor of the 20th inst., is received. In reply, I would say that the laws now in force regulating the assessment of railroads, are included in chapter 13, title 4, part 1 of the Revised Statutes, and require :

1*st.* That the real estate shall be assessed in the town or ward where the same shall be, and the personal estate in the town or ward where the principal business office is situated.

2*d.* That the officers of these corporations shall, on or before the first of July in each year, deliver to the assessors of any town or ward where they are liable to taxation, a written statement, specifying the real estate owned in each town and its cost, the capital stock paid or secured to be paid, and the proportion, if any, held by the state or any incorporated literary or charitable institution, and the town or ward where their principal business is transacted.

3*d.* That their property shall be entered by the assessors in the assessment rolls, if in the town or ward where the principal office is located, in conformity with section 7, chapter 13, title 4, part 1 of the statutes. In other towns or wards, where there is nothing but the real estate to assess,

it would appear unnecessary to do more than simply enter the name of the corporation, describe the property, and estimate its value.

*4th.* That the roadway, superstructure and buildings, if any, which constitute the real estate, shall be assessed on the standard of actual value for the purpose to which they have been adopted, and not as mere land.

*5th.* That the capital stock, which covers the personal estate, including the surplus, if any, over ten per cent, shall be assessed on the same principle, after deducting the assessed value of the real estate and taxable stock of other corporations, as required by section 10, chapter 13, title 4, part 1 of the statutes. The best *criterion* of the value of a stock is the market price, which when it can be ascertained, represents the intrinsic value more nearly than any other standard within reach of the assessors.

It may be added that the difficulty of arriving at a correct interpretation of the laws for the assessment of corporations, is increased from the fact that they are general, applying to all classes, and affording no distinct and well defined rule in special cases. The construction given to them by this department in their application to railroads, is believed to be in conformity with judicial decision, and will, it is presumed, afford an intelligent answer to the inquiry contained in your letter of the 20th inst.

There have been no important changes in the law since the publications of compilation distributed in 1856, except such as are included in fifth edition of the Revised Statutes, which is the edition here referred to.

Respectfully yours,

THOMAS HILLHOUSE, *Comptroller.*