[No. 1473.]

THE STATE OF NEVADA, RESPONDENT, *v.* THE VIRGINIA AND TRUCKEE RAILROAD COMPANY, A CORPORATION, APPELLANT.

DEFENSE TO SUIT FOR DELINQUENT TAXES—EFFECT OF ACT OF 1895.—Prior to the amendment of section 52 of the general revenue law (Stats. 1895, p. 35), the defense by a defendant, sued for delinquent taxes, "that the assessment is out of proportion to and above the actual cash value of the property assessed," could not have been made.

TAXATION—VALUE OF RAILROAD, HOW DETERMINED—NET INCOME, WHEN GOVERNS.—The actual cost of a railroad is *prima facie* its value; but if it appears that the actual cost was in excess of the necessary cost, the necessary cost is its proper standard. If it further appears that the net income of the road does not amount to current rates of interest on its necessary cost, and is not likely to do so, or if the business of the road is likely to be destroyed or impaired, by competition or other cause, or, in short, if the utility of the road is not equal to its cost, then its value is less than its cost, and must be determined by reference to its utility alone. (*State* v. *Central Pacific R. Co.,* 10 Nev. 47, affirmed.)

IDEM—MEANING OF TERM "CASH VALUE" AS APPLIED TO RAILROADS.—Under Stats. 1891, pp. 137, 138, providing that all property shall be assessed at its actual cash value, and that the term "cash value" means the amount at which the property would be appraised if taken in payment of a just debt from a solvent debtor, the value of a railroad for the purpose of taxation must be determined mainly by its net earnings, capitalized at the current rate of interest, taking into consideration any immediate prospect of an increase or decrease in the earning capacity or the road.

IDEM—ASSESSMENT—EVIDENCE INSUFFICIENT TO SUPPORT—NO SUBSTANTIAL
CONFLICT OF.—Evidence of an assessor, who valued a railroad for tax-
ation, that he took into consideration the business the road seemed
to be doing, certain mining developments which, at the time of the
trial, proved to be worthless; the material in the road and its condi-
tion; that he did not examine the reports of the road, filed in the
office of the secretary of state as required by law, nor make any
inquiry as to the amount of its business, leaving both this and pro-
spective change in the value of business out of consideration, as
well as the decrease in the earnings of the road; that if he had
known that the earnings had greatly decreased, it would not have
made any difference in his judgment of its value, etc., it appearing
that he had no special knowledge of the value of a railroad, is insuf-
ficient to create a substantial conflict in the evidence, where the
undisputed facts show that, according to the correct method of
valuation, the assessment is too high.

IDEM—NET EARNINGS OF RAILROAD—EXPENSE OF REPLACING BRIDGE
REDUCED.—In estimating the net earnings of a railroad as a basis
for ascertaining the value of the road for the purpose of taxation,
the cost of replacing a bridge should be deducted as a part of the
expense of that year.

EVIDENCE—NO SUBSTANTIAL CONFLICT—RULE.—The rule that a verdict on
conflicting evidence will not be disturbed relates only to a substan-
tial conflict.

APPEAL from the District Court of the State of Nevada, Washoe county; *A. E. Cheney*, District Judge:

Action by the State against the Virginia and Truckee Railroad Company, *et al.*, to recover taxes assessed on the railroad for the year 1895. From a judgment for plaintiff, and an order denying a new trial, defendants appeal. Reversed.

Action to recover taxes due for the year 1895, amounting to $5,369 10. The defendant made the statement to the assessor, required by the statute, valuing its railroad in Washoe county at $131,800. This the assessor refused to accept, but assessed it at the sum of $254,325. Upon complaint by the defendant to the board of equalization of Washoe county, this assessment was sustained. Upon the taxes becoming due the defendant tendered in full payment thereof $3,173 86, which was refused by the tax collector. To the action the defendant made answer that the actual cash value of its road in Washoe county was but $131,800. The case was tried before a jury and a verdict rendered in favor of the state, finding the value of the property to be the same as fixed by the assessor. From the judgment entered

upon this verdict, and an order refusing a new trial, the defendant appeals.

*W. E. F. Deal,* for Appellant:

I.   The assessment made by the connty assessor was an arbitrary one, made without any knowledge or attempt on the part of the county assessor to obtain knowledge of the value of the property in question.   The county assessor testified that he was elected county assessor of Washoe county in 1894.   His term of office commenced in 1895, in January; he had been deputy county assessor four years; he had been on the railroad frequently, and assessed it in 1895 at $9,500 per mile for the main track and $5,000 per mile for the side track; making the sum of $254,325 for that portion of the railroad·in Washoe county.   He testified that to a certain extent he took pains to ascertain the value of the road, and fixed the value of what the property would bring if appraised and taken by a creditor from a solvent debtor for a just debt, and that he assessed all the property in Washoe county for the actual cash value; that on making the assessment he took into consideration the current rate of business the railroad was doing; the prospects in the Pine Nut country, the developments that might be in the Comstock, and the condition of the road.   He further testified that he watched the business at Reno, the travel over the road, and the improvements that had been made in 1894, and that he concluded the road was not going down if they were making improvements; that the improvements he had noticed were the steel bridge over the Truckee river, the repairs in general, the ballasting, etc.; that he had an idea that the bridge cost from $10,000 to $14,000, and that this idea had something to do in making up his judgment as to the value, and that the cost of the bridge to some extent influenced him as to the value of the road.   He made no inquiries to ascertain what the business of the road was, nor did he examine the report of the company of its receipts and expenditures.   He could not say that if he had known that the net earnings of the road amounted to $8,642 52 in the year 1894, that that would have had any effect upon his judgment.   If he had known what the gross receipts and gross expenditures were for the

year 1894, he could not say that this would have any effect upon his judgment. He did not examine the company's report for the fiscal year 1893, and, if he had, it would have had no influence upon his judgment, nor would it have made any difference in his judgment if he had known that the net receipts of the company had fallen from $102,341 52 in 1893 to $8,642 52 in 1894. He further testified that he did not take into consideration any decrease in the earnings, and that he did not go into the business of the company as shown by the reports at all; that he made no inquiry of the officers of the company during any of the years he had been assessor.

II. The whole testimony of this witness showed that he arbitrarily assessed this property, without taking into consideration its receipts, its expenditures or its business, and without making an inquiry to ascertain any elements of value of such property. He declared that he did not take into consideration the depression in business in every place the appellant depended upon for its business, and that he did not take into consideration the business of the company, and that the prospects of the Pine Nut country and developments on the Comstock had proved delusive.

III. The only other testimony on the part of the state as to the business of the company was that of George E. Peckham, who testified that he noticed, while at work, the trains passing over the road, and that there were a larger number of special trains in the last year or two than formerly, but his observations were confined to the road near his place.

IV. The testimony on the part of the state adds nothing to the *prima facie* case made by the introduction of the delinquent assessment roll.

V. The appellant's testimony amply sustained the correctness of the statement made to the county assessor. It was shown that the cost of the railroad exceeded $3,000,000; that another railroad, as good and as well adapted for the purpose, could have been built in 1895 for the sum of $1,500,-000, exclusive of the value of the right of way. It was shown that the current rate of interest for the year 1895 was 8 per cent per annum. In the year here in question, 1895, the net profits were $27,467 53, and from the 30th of January, 1895,

to the time of the trial, May, 1896, the net profits were $16,962 17. At the same rate for the year ending the 30th of June, 1896, the net profits would have been about $20,000. So that based upon the business of the road, the value of the road decreased after the fiscal year 1895. The proof showed that the whole length of appellant's road was 77.89 miles, of which 51.75 was main track and 26.14 side track; that the portion of the road within the county of Washoe constituted 29.20–77.89 of the whole road. Based upon the utility of the road (the earning capacity) the whole road was not worth to exceed the sum of $344,120, and it had not been worth to exceed that sum since June 30, 1893, and it was not likely to be worth more than that. On the contrary, the evidence showed that, based upon its utility, the road would decrease in value.

VI. To fix any such value as that placed by the assessor upon the road within Washoe county, $254,325, the value of the whole road, based upon the net earnings of the company, should amount to about $678,403, and the net income of the road should have been about $54,272 24, nearly double what it actually was.

VII. The court has settled the law applicable to the assessment of railroads in this state for the purpose of taxation. (*State* v. *C. P. R. R. Co.*, 7 Nev. 781; *State* v. *C. P. R. R. Co.*, 10 Nev. 47.)

VIII. The assessor must be governed by just rules when he values property for the purpose of taxation. He must take into consideration the elements which constitute value. His judgment, without any fact or reason to sustain it, cannot be allowed to stand when it is affirmatively shown that his judgment was neither based upon the actual business of the road, nor upon the prospective, nor upon its income, nor any other element of value. Upon his showing the only thing that made him a competent witness was his official character; any other witness would have been excluded from the stand upon such utter lack of knowledge as was shown by the assessor.

IX. Applying these legal principles, in cases cited *supra*, 7 Nev. 781, 10 Nev. 47, which are supported by sound reason in addition to their authority to this case, the court will see

that the assessment of which appellant complained was nearly double what it should have been; there is no fact in the case that the finger can be laid upon to justify this verdict, and it must be set aside. To allow it to stand against the overwhelming testimony would constitute jury trials a farce, and would constitute county assessors absolute masters of every citizen's property.

X. The contention of counsel for respondent that, upon the facts as established by the evidence in the case, appellant would have had no remedy against the assessment as made by the assessor prior to the act of 1895, cannot prevail. For every such injury, and for every such deprivation of a right, there is, and always has been, a remedy under the constitution and laws of Nevada. (Art. X, sec. 1, Const. Nev.; Stats. 1895, p. 169.)

XI. The words "true cash value," "just valuation," "full cash value," "actual cash value," mean one and the same thing. If any of them mean that a citizen's property can be assessed for more than it would sell for, then an unjust valuation could be made which would be contrary to the constitution. It is very clear that the legislature, in giving the definition of the term "full cash value," intended to assist the assessor in making his assessment. In order to determine what a given piece of property would be appraised at, if taken in payment of a just debt by a solvent debtor, the elements that go to make its value must be ascertained.

XII. Whether dicta or not, the rule laid down in 10 Nev. 74, furnishes a just and, in fact, the only, mode of ascertaining the value of railroads for the purposes of taxation, and is in accordance with the laws of this state.

*R. M. Beatty,* Attorney-General, *F. H. Norcross,* District Attorney, and *Torreyson & Summerfield,* for Respondent:

I. Under the various revenue acts of Nevada, previous to the year 1895, the action of the board of equalization in reviewing the valuations of property by assessors, in the absence of fraud, was final and conclusive.

II. The court will not weigh the evidence in this case and decide which party litigant in its judgment adduced a preponderance of testimony. If there is a substantial conflict

in the testimony, this appellate court will not exclude the judgment of the jury and the trial court by substituting its opinion therefor. (*Dennis* v. *Caughlin,* 44 Pac. 818; *Beck* v. *Thompson,* 36 Pac. 565; *Pinschewer* v. *Hanks,* 18 Nev. 103; *Overman Co.* v. *Corcoran,* 15 Nev. 151.)

III.   There is substantial evidence to support the verdicts of the jury, and the trial court has approved the verdicts by refusing a new trial. In such a case the appellate court will not reverse the judgment on appeal. (*St. Louis & S. F. Ry. Co.* v. *Brown,* 45 Pac. 118; *Ward* v. *Christy,* 38 N. E. 533; *Davis* v. *Hilbourn,* 59 N. W. 379; *Jones* v. *Singer Mfg. Co.,* 18 S. E. 478.)

IV.   It is entirely immaterial whether the assessment was arbitrary or considerate in its determination by the assessor; whether the assessor was negligent or diligent in seeking knowledge of the value of the property in dispute; and whether the assessor employed correct or erroneous mental processes and principles in determining its value, provided that he did not fix the valuation at more than the full cash value of the property. If a substantially correct result is attained, the law is satisfied without analyzing the methods by which it was reached.

V.   Appellant appears to rely in considerable confidence upon the opinion of this court in the cases of *State* v. *C. P. R. R. Co.,* 7 Nev. 99, and *State* v. *C. P. R. R. Co.,* 10 Nev. 47. In the first-mentioned case the court below had sustained demurrers to the original and to the amended answer, each of which alleged a fraudulently excessive valuation of railroad property. In the course of its decision the court expressed the language quoted by appellant. It appears to be dicta, but at any rate it contains nothing to support appellant's theories or in anywise militating against respondent's positions herein. There is no issue of fraud in this case.

VI.   The decision in 10 Nev. was rendered under the revenue laws of the state of Nevada as they existed in 1870. At that time the statutes did not prescribe any subsidiary principles to control or guide the valuation of property in general, or of railroad property in particular, for the purpose of taxation. In the absence of any statute relating to the assessments of railroads in particular, the court, by Justice Beatty,

expressed the views quoted in appellant's brief. That it is mere dicta is perfectly plain in view of the fact that at that time the valuation of property, as equalized by the board of equalization, in the absence of fraud upon the part of the assessor, or board of equalization, was conclusive, and not a matter for review or determination by the courts. Having no jurisdiction to determine the value of property for the purpose of taxation, it would seem clear that the courts had no jurisdiction to decide methods to be employed in the determination of values.

VII. Section 4 of the act of 1875, and section 3 of the act of 1893, expressly provide " that in ascertaining, assessing, and fixing the value of any railroad for taxation the assessor shall assess it the same as other property." Either this provision is meaningless, or all non-exempt property in Nevada should be valued by the same process of estimation, or the views expressed in 10 Nev., as contended for by appellant, are not the law and are not applicable under the present statutes.

VIII. Appellant claims the right to deduct all salaries, cost of operating, expenses, repairs, taxes, and all expenses whatever, from the gross receipts in order to ascertain the net income, and then to simply capitalize the net income at the current interest rate to fix the full cash value of its railroad for taxation purposes. It is safe to assert that there is hardly a ranch, piece of real estate, or stock of goods, wares and merchandise, which, valued under such a rule, would have any value for taxation whatever.

IX. The evidence is amply sufficient to sustain the verdict of the jury. The annual report of appellant, filed with the secretary of state under the requirements of the law, shows that the net earnings of the Virginia and Truckee Railroad in the year 1895 was $33,467 53. Ignoring the element of a prospective increase of net earnings, and applying the views contained in the 10 Nev. case with rigid exactness, and you reach a result as follows: $33,467 53 divided by .08 equals $418,344 13, as the value of the whole road. As assessed by the Washoe county assessor at a valuation of $9,500 per mile of main track and $3,000 per mile of side track, we have the following result, which includes the ele-

ment of prospective value: 51.75×$9,500=$491,625; 26.14×
$3,000=$78,320, or $569,945 as the value of the road. The
difference between $418,344 and $569,945, which is $151,601,
therefore represents the prospective increase in value as
determined from the evidence of the assessor, the board of
equalization, the jury and the trial court, and amounts to a
little more than one-third of the value insisted upon by
appellant ignoring the element of prospective value.

X. The evidence clearly established the fact that appel-
lant's railroad had a prospective value at the time it was
assessed in 1895. In 1892, only three years before the assess-
ment in dispute, the net earnings were $202,225 68. Apply-
ing the same rule, its taxable value then was $2,527,821, or
$42,130 per mile. Taking the average net earnings for the
ten years immediately preceding the year 1895, and apply-
ing the same rule, the average value of the road would be
$3,167,250, or $52,787 per mile. The entire testimony showed
that a large proportion of the roadbed had been lately well
ballasted, and that it, as well as the fences, cattle guards,
culverts, bridges, and other improvements, were in a good
condition, and would need very little repairing for several
years.

XI. It being shown by appellant's annual report that, in
1895, its net earnings were increasing at the rate of almost
400 per centum over those of the preceding year, and that
fact being fortified by the evidence above cited, and it being
further a universally admitted fact as well as principle of
law that prospective values, when founded upon reasonable
probabilities, or even speculative probabilities, are and con-
stitute one of the most important elements to be considered
in assessing property for the purpose of taxation, and
especially and particularly in the case of railroad property
because of a sensitively fluctuating character, being likened
by appellant's leading expert witness, Mr. E. Black Ryan, to
a thermometer, and registering the most delicate variations
in general business, it is submitted that the jury and the
court were amply justified in rendering their verdicts and in
denying appellant a new trial.

XII. Appellant steadfastly maintains, in effect, that the
valuation of its railroad in 1895, for the purpose of taxa-

tion, should have been determined with reference to the earnings of that year alone. This is an obviously erroneous principle. If such a principle should be sustained, it would amount to a holding that, if such extensive repairs should have to be made all in one year as to absorb the income of the railroad for that year, it would have no taxable value that year. And yet the volume of business for that particular year might exceed that of any other, and the complete repairs made during the year would increase the net earnings of the road for many years thereafter by reason of the fact that few repairs would be required for the several ensuing years.

By the Court, BIGELOW, C. J.:

By act of March 9, 1895 (Stats. 1895, 39), section 52 of the revenue law was amended so as to permit a defendant sued for delinquent taxes to answer "that the assessment is out of proportion to and above the actual cash value of the property assessed." Prior to that amendment this defense could not have been made. (*State* v. *C. P. R. R. Co.*, 21 Nev. 172, 178.) The defendant answered under this amendment, but the jury found against it, and the question presented upon the appeal is, what was the actual cash value of the defendant's road in Washoe county?

The respondent first contends that the evidence as to value is conflicting, and that consequently this court cannot interfere with the verdict. That is undoubtedly the general rule, but for it to have this effect there must be a substantial conflict. It is not sufficient that there is some evidence supporting the verdict, if it is so weak and inconclusive as not to raise a substantial conflict with that produced against it. (Hayne, New Trial and Appeal, sec. 288; *Watt* v. *Nev. Cent. R. R. Co.*, 23 Nev. 155.) We think that is the case here. While there is some evidence in support of the verdict, it is so weak and is so completely upset by the undisputed facts that it does not raise a substantial conflict as to the true value of the road.

The constitution of Nevada, art. X, provides that all property, both real and personal, shall be assessed and taxed at an equal and uniform rate, and shall receive a just valu-

ation. By Stats. 1893, p. 110, sec. 4, it is provided: "In ascertaining, assessing and fixing the value of any railroad for taxation, the assessor shall assess it the same as other property, and shall consider, treat and assess the portion thereof at its value within his county as an integral part of a complete, continuous and operated line of railroad, and not as so much land covered by the right of way merely, nor as so many miles of track consisting of iron rails, ties and couplings." By Stats. 1891, 137, 138, it is directed that all property shall be assessed at its actual cash value, and that the "term 'full cash value' means the amount at which the property would be appraised if taken in payment of a just debt due from a solvent debtor."

A railroad then, the same as every other class of property, is to be assessed at its true cash value—at such an amount as it would be appraised if taken in payment of a just debt due from a solvent debtor—but this does not necessarily mean that the same rules and principles are to be applied to all the different kinds in determining what their true cash value is. The true value of each class is to be determined by evidence applicable to that class. Wherever property has a well-defined market value, which is usually the case with personal property, with town and farm property, the market value is usually the best criterion of its value for purposes of taxation. It is fair to presume that property to be taken in payment of a just debt from a solvent debtor would be appraised at what it is reasonably worth in the market—at what it would probably bring. So one rule is really the equivalent of the other.

But there are many other kinds of property to which this test would be entirely inapplicable. It cannot be said, although sometimes bought and sold, that they have a market value. Such, for instance, is a water ditch, a salt marsh, a borax field, or a mine of any kind. A toll road is another instance. Take, for example, the famous Geiger grade, which must have cost many thousands of dollars, and have been, at one time, a wonderfully productive piece of property, but which now would probably not pay the wages of a toll-keeper. The market cannot be appealed to to fix a value upon such property, but its value may be and must be

fixed by other obvious considerations. A railroad comes within this class. Railroads are bought and sold so seldom, and the value of each road depends so entirely upon its surroundings, that in determining the amount at which such property would be appraised if taken in payment of a debt, we must resort to other principles.

· Railroads are usually constructed and operated for profit. They are not valued, as men sometimes value a beautiful home, a horse or a diamond, for the pleasure that comes from their ownership, but from the ·returns that can be obtained from them as a business investment. Neither are they usually held for speculative purposes as much other property—particularly unimproved lands, town and city property—is so often held. The value of a railroad is generally strictly prosaic and utilitarian.

To obtain any return from it, either present or prospective, a railroad must be operated. It cannot lie idle and at the same time increase in value through the natural increase of population and business. As it must be operated, expense must be constantly incurred, and the result is that its true value as a railroad depends very largely—almost entirely—upon what its net income can be expected to be.

It is reasonable to suppose that the owners of a road will operate it to their own best advantage; that they will obtain all the income possible, and keep the expense of operation as low as possible. This should certainly be the presumption in the absence of a showing to the contrary; and it follows, where a road has been operated for a number of years, that what it has done in the past is a very good criterion of what it may be expected to do, under the same conditions, 'in the future.

Then, after ascertaining this net return, it is necessary to take into consideration the surrounding conditions, which also cut some figure in the problem, such as the condition of the road, in order to determine whether the expense of keeping it in repair will be greater or less than in the past, and the condition of the country tributary to the road, in order to form a judgment of whether its business is likely to increase or decrease or remain stationary. In fact, the true cash value of the property—its value for taxation—should

be determined by the same matters that would be considered by one who wished to purchase and who was simply endeavoring to ascertain what the road was worth.

In the case of *State* v. *C. P. R. R. Co.*, 10 Nev. 47, this whole matter was very thoroughly considered by as able a bench as it has ever been the good fortune of this state to have. From the opinion by Beatty, J., we make the following short extract: "To determine the value of a railroad, then, the very first inquiry is as to its actual cost. That, *prima facie*, is its value. But if it appears that the actual cost was in excess of the necessary cost, the necessary cost is its proper standard. If it further appears that the net income of the road does not amount to current rates of interest on its necessary cost, and is not likely to do so, or if the business of the road is likely to be destroyed or impaired by competition or other cause, or, in short, if the utility of the road is not equal to its cost, then its value is less than its cost, and must be determined by reference to its utility alone."

It is claimed, however, that what was said in that case as to the correct rule for fixing the valuation of a railroad was dictum.

We do not so regard it, as the defense in that case was that the road had been fraudulently over-valued. In considering this defense the first point to be determined was whether there had been any over-valuation at all. Upon its theory of how a road should be valued, the defendant had established that there had, and this brought the question of what was a correct theory squarely before the court. But no matter. Whether what was there said was necessary to the decision of that case or not, we regard it as a substantially correct statement of the law, and we find it supported by many other cases.

Thus, in *People* v. *Keator*, 67 How. Pr. 278, the court held as follows: "In complying with this provision of the law, as a railroad property cannot as a dwelling have any fancy value by reason of its location or the expenditure thereon of large sums of money which would conduce to the comfort of the owner, it is evident that the assessors, in fixing its value, must be very largely controlled by its ability to earn money,

and the productiveness of its use for the purposes of a rail-road. As an original question it would seem to be reasonably clear that the value of a railroad property must almost entirely depend upon its capacity to earn money for its owners, and that therefore no creditor would receive from a solvent debtor in payment of his debt railroad property at a greater price than that which would be a fair one based upon its earning capacity." In *People* v. *Weaver*, 67 How. 479, a case involving the value of a bridge, the same court said: " In determining the value of the property of the relator in the mode which the statute directs, it is an evidently sound proposition that the true criterion of such value must be its earning capacity."

In *People* v. *Hicks*, 40 Hun, 601, we find the following, which we adopt as a very careful statement of the law: " The estimate of value of any portion of the road cannot be intelligently made without some knowledge or information of it as a whole, and its business, earnings and ordinary expenses. Railroads are constructed with a view mainly to revenue and profit upon investments. And hence the productive capacity and its earnings are matters for consideration in the estimate of their value. And the extent to which actual net earnings of a road should govern or aid such estimate is dependent upon circumstances. No arbitrary method can be prescribed of ascertaining value. In some cases the earnings of a road may be entitled to much more consideration than in others. The cost of the road is also usually to be taken into account, and the value depends much upon relations present, and in reasonable contemplation, because the value of property may considerably be dependent upon defined unappropriated means and facilities for increased business connections and relations and the importance of the consequences to follow." To the same effect are *Trustees Cincinnati South. Railway* v. *Guenther*, 19 Fed. 395; *People* v. *Pond*, 6 Abb. New Cases, 1. See, also, *People* v. *Fredericks*, 48 Barb. 173; *State* v. *C. P. R. R. Co.*, 7 Nev. 99.

Perhaps, to avoid a misunderstanding of our decision, it should be stated in this connection that the value of a portion of a road is not necessarily a fractional part of the whole. Owing to local considerations, it may be greater or

less.   But we find nothing in the evidence in this case indi-
cating any difference, and it is only mentioned to avoid a
misconstruction of the opinion.

Without contradiction, the evidence in this case shows the
following facts:   That the cost of construction of the road
was $3,780,452 96; but that it could now be replaced, exclu-
sive of the right of way, for $1,500,000.   That for the year
ending June 30, 1894, the net earnings were $8,642.52; for
the year ending June 30, 1895, $27,449.53; and for the year
ending June 30, 1896, of which the last three months were
estimated upon the basis of the receipts for the preceding
nine months, $21,077.71, from which should be deducted, at
least, $6,898.23, the amount the defendant admitted to be
due Storey and Washoe counties for taxes for the year 1895,
and possibly more, depending upon the result of this, and a
similar action in Storey county, leaving net for that year
$14,179.50, or less.   It is not claimed that these figures are
incorrect, nor that the gross receipts of any year might have
been increased by proper management, or the amount of
expense decreased.

It was also shown, without contradiction, that the current
rate of interest in Washoe county was 8 per cent per annum.
Whether a broader view should not have been taken upon
this point, and the rate of interest fixed at a lower figure, we
have no data upon which to form a conclusion.   There was
no evidence that it was too high, and, for the purpose of this
appeal, it must consequently be accepted as correct.

It was also shown, again without contradiction, that there
is no prospect in the near future that the business of the road
will increase.   In fact, it seems quite probable that, if any-
thing, for some time to come, the receipts must decrease.   In
this connection it is argued that the jury had a right to exer-
cise their own judgment in determining whether there was
a probability of future improvement; that they could take
judicial notice of the condition of the country, and deter-
mine as well as an expert whether business was likely to
increase, and that having done so, their judgment cannot be
revised by this court.   Admitting, without deciding, that
they could take such notice of surrounding conditions, then
this court has the same right and the same knowledge that

the jury had, and the same as a finding upon any other point, there must be something substantial upon which to base it.  If the jury can take judicial notice of a thing, it must be of something that exists, not of something that does not, and there can be no question that there is nothing now except pure speculation upon which to base such a belief. There are no improvements contemplated and in process of construction, and no new mining camps discovered and developed to such an extent in the region of country tribu-utary to the defendant's road as make it reasonably certain that they will add materially to the income of the road in the near future.  To affect the present value of the road . such prospective improvement must be more than a possi-bility.  It must be so near and so certain that a business man purchasing the road would take it into consideration. (*People* v. *Weaver*, 67 How. Pr. 477.)  It is present, and not prospective, value that is in question.  (*People* v. *Roberts*, 38 N. Y. Supp. 724.)

It is very probable that in time new mining discoveries will be made, or present ones further developed, and new enterprises opened up that will bring in an increased population and add to the business of this road, and we cer-tainly believe that such will be the case, and when this happens it will add to its value, but this possibility does not, as a business proposition, add materially to its present value.

From the foregoing data, which certainly, in the main, cover the elements to be taken into consideration in deter-mining the value of this road, there can be no question that the portion of the road in Washoe county is not of the true cash value of $254,321, as fixed by the verdict.

It does not seem reasonable that the value of a road should be fixed in view of the net receipts for any one year, which, owing to abnormal conditions, may be greater or less than the average, but we are not called upon to consider that point here.  We should certainly not go back beyond the railroad fiscal year 1893–4, because the evidence shows that the conditions which produced a net profit the year before of $102,341 52 no longer exist, and if we should put the years 1893–4, 1894–5, and 1895–6 together, the average would

not be less than the receipts of 1894–5.  So considering that
year alone, the net receipts were $27,449 53.  That sum cap-
italized at 8 per cent represents $343,119 12, as the value of
the entire road, not taking into account the rolling stock and
other personal property, consisting of 51.75 miles of main
track and 26.14 miles of side track, of which amounts there
are 25.65 miles of main track and 3.55 miles of side track in
Washoe county.  Several different ways of figuring Washoe
county's proportion of the entire valuation may be adopted—
depending upon the view taken of the side track—but under
none of them can it amount to near the sum of $254,321, as
fixed by the verdict.

In making the above estimate, and in basing it entirely
upon the earning capacity of the road, we do not wish to be
understood, as we have stated before, as holding that there
may not be other considerations, which in some cases would
cut quite a material figure.  We simply hold that the earning
capacity is the main consideration, and that as shown in the
evidence in this case, as reported to us, we discover no others
of sufficient importance to affect the result.

The only evidence tending to support the verdict is that of
the assessor.  He testified that in his judgment the road in
Washoe county was worth what it was assessed for.  It
appeared, however, that he had no special knowledge of the
value of a railroad, nor was he any better qualified to testify
to the value of one than almost any other man in the com-
munity.  He stated that in making the assessment he had
taken into consideration the business the road seemed to be
doing, certain mining developments which, at the time of the
trial, had turned out to be worthless, the material in the road
and its condition; that he did not examine the reports of the
road, nor did he make any inquiry to ascertain what busi-
ness it was or had been doing; that he did not take into con-
sideration any decrease in the earnings of the road, and that
if he had known they had greatly decreased, it would not
have made any difference in his judgment of its value; that
in making up his judgment he did not take into considera-
tion what the business had been nor what it might be in the
future.

In making the assessment he seems to have looked the

property over, and to have come to the general conclusion it was worth the value he placed upon it.   This would be all right so far as the assessment was concerned, if he hit it right, because the law does not require the assessor to act upon any particular kind of evidence; but when it comes to testifying as an expert, he must be able to give some reason for his conclusions, or they are not entitled to much weight.   Certainly he was able to give none here, and we cannot consent to the claim that such evidence creates a substantial conflict with the undisputed facts shown by the defendant.

There is also a question as to whether a part of the cost of a steel bridge across the Truckee river, erected in the year 1894, should be deducted as a part of the expense of that year.   As we understand the facts relating to that matter, they are as follows:   The old wooden bridge had become decayed to such an extent that it was necessary to replace it with a new one.   The cost of a new wooden bridge would be $6,018; of a new steel bridge $7,812 79.   The company concluded to put in a steel bridge, and it now claims that what it would have cost to build a wooden bridge should be deducted as a part of the annual expense of keeping up the road, and that only the difference between the cost of the two should be charged to construction account.   We see no reason why this is not correct.   Replacing a worn-out bridge would seem to be as much an expense of keeping a road in repair as would replacing old ties, old rails or old culverts, and in our statement of the net earnings of the road we have accordingly deducted it.   As this expense will not have to be incurred again, it is fair to suppose that the future net earnings will be increased by that fact.

Judgment and order reversed, and cause remanded for a new trial.