[No. 1662.]

# THE STATE OF NEVADA, RESPONDENT, v. THE NEVADA CENTRAL RAILROAD COMPANY, ET AL., APPELLANTS.

1. TAXATION—RAILROADS—CASH VALUE—COMPUTATION—METHOD. The cash value of a railroad for purposes of taxation must be determined mainly by its net earnings capitalized at the current rate of interest, taken in consideration with any immediate prospect of increase or decrease in earning capacity; and if the utility of the road, as so determined, is not equal to its cost, which is *prima facie* its value, then the value must be determined by utility alone.

2. SAME—NET INCOME—GROSS RECEIPTS—EXPENDITURES. The net income of a railroad for purposes of taxation is the difference between the gross receipts and expenses as they would .have been under reasonably economical and prudent management.

3. SAME—EARNINGS—EXPENDITURES—CLASSIFICATION—EVIDENCE. On an issue as to the earning capacity of a railroad for purposes of taxation, classifications of items of expense by the railroad company in its ledger or other accounts are not evidence in its favor, except as they are substantiated by the original entries of the transactions in the · railroad's books.

4. SAME—BOOKS—PRODUCTION—WAIVER. Where, on an issue as to the earning capacity of a railroad for purposes of taxation, the railroad's books were not placed in evidence, but each party sought to prove a result from them through the examination and opinion of an expert, and · each objected to the opinion of the opposing witness, without making any objections as to the books themselves, the introduction of the books was waived.

5. SAME—PRESUMPTIONS—EXPENDITURES. On an issue as to the earning capacity of a railroad for purposes of taxation it would be presumed, in the absence of a contrary showing, that charges for things essential to the operation of the road represented reasonable and economical expenditures.

6. SAME—EXPERTS—OPINIONS. Prac. Act, 427 (Comp. Laws, 3522), provides that there shall be no evidence of the contents of a writing other than the writing itself, except when the original is lost or destroyed, or in the possession of the adverse party, and he fails to produce it after notice; when the original is a record or other document in custody of a public officer or officer of a corporation; when the original has been recorded, and a certified copy is made evidence by a statute; and when the original consists of numerous accounts or other documents, which cannot be examined in court, and the evidence sought by them is only the general result of the whole. *Held*, that where, on an issue as to the earning capacity of a railroad for purposes of taxation, whether certain charges of expense were legitimate, and whether earnings other than those shown should not have been received, was disputed, it was error to permit expert accountants, who had examined the corporation's books, to give parol evidence of their opinion as to what the railroad's net earnings should have been by such witnesses making an arbitrary classification and exclusion of debits and credits.

7. SAME—CLASSIFICATION OF ITEMS—SUBMISSION TO COURT. Where, on an issue as to the earning capacity of a railroad for purposes of taxation, whether certain items of debits and credits should be included was disputed, such items should be properly classified and submitted to the court for its determination, and opinion evidence of expert accountants as to such determination was inadmissible.

8. SAME—OFFERS TO PURCHASE. On an issue as to the value of a railroad for taxation in 1901, evidence of an offer of $200,000 for the road, made to its general manager in 1900 by parties who had neither the intention nor the ability of buying for themselves, but who made the offer on behalf of certain others, who were not shown to have been able to have consummated a sale, was inadmissible.

9. SAME—TAXES PAID. On an issue as to the value of a railroad for purposes of taxation, taxes actually paid by the railroad should be added to its operating expenses and deducted from its gross income.

10. SAME—MORTGAGES—BONDS—STOCK. On an issue as to the value of a railroad for purposes of taxation, evidence that a mortgage had been given on all the railroad's property to secure bonds for $750,000, that 7,500 shares of stock had been issued of a par value of. $100 a share, and that a certain county had issued $200,000 in bonds in aid of the road, was admissible as tending to show its cost.

11. SAME—TAX RATE—VALIDITY—PRESUMPTIONS. The Nevada revenue act provides that county commissioners may levy an ad valorem tax in each county of $2 on each $100 valuation, provided that no levy in excess of $1.50 per $100 shall be made for county purposes, unless the county is indebted for liabilities contracted prior to January 1st next preceding the making thereof, not bonded or funded. *Held* that, in the absence of proof that a county levying a tax in excess of $1.50 per $100 was not indebted for liabilities contracted prior to the year of the levy, it would be presumed in support of the levy that it was so indebted.

12. SAME—WITNESSES—COMPETENCY. Where a witness had not made computations of railroad earning balances for a series of years, as to which he was asked to testify, and did not know whether such balances were correct, nor what items they included, he was not entitled to testify thereto.

APPEAL from the District Court of the Third Judicial District, Eureka County; *Peter Breen,* Judge.

Action by the State of Nevada against the Nevada Central Railroad Company and others. Judgment for plaintiff, and defendants appeal. **Remanded for new trial.**

This is an action by the state for the taxes for the year 1901 on 93 miles of main track and 2 miles of side track and the other real property of the Nevada Central Railroad Company, all situated in Lander County. The assessor placed the valuation at $158,100, and made the assessment at $5,684.97, which, with the statutory penalties, aggregates

$8,063.43, the amount demanded in the complaint, and for which the verdict and judgment were rendered. After denying the allegations of the complaint, the answer sets up the defense that the assessment was out of proportion to and above the cash value of the property, and asserts that in the year 1901 the property was not of any greater cash value in the aggregate than $60,944.

It is also alleged that the tax levy in that county for the year 1901 is illegal because in excess of the rate authorized by law. Seeking to avoid penalties for delinquencies, the defendant made and pleaded a tender of $1,835 for taxes upon this property. Upon the trial the state introduced the delinquent list and rested. Thereupon the defendant submitted in evidence the minutes indicating that the taxes levied by the board of commissioners for that year for county purposes aggregated $1.57 on each $100 of taxable property, and introduced testimony showing that the road was finished in February, 1880; that it has iron rails weighing only 35 pounds to the yard, instead of much heavier steel rails used by all up-to-date railroads; that the ties are in poor condition; that for the most part it is ballasted only with sagebrush dirt; that the cost of repairs in future years will be increased, and that the condition of business in the adjacent county will not tend to increase earnings; that, if the Southern Pacific Railroad cuts off the curve at Battle Mountain, and runs directly by the river as surveyed, and evidently contemplated by the purchase of rights of way, the Nevada Central will be compelled to build two or three miles of new track in order to connect; that the removable value of the material which constitutes the 93 miles of road and all the property under the levy was $41,135.35 in 1901; that the rate of interest on different classes of loans in Lander County that year varied from 6 per cent to 12 per cent; that San Francisco savings banks paid $3\frac{1}{8}$ per cent; that money in New York was worth $3\frac{1}{2}$ per cent to 5 per cent, and that United States bonds paid less than 2 per cent per annum. There was testimony that so large an amount could not be placed in Lander County.

Subject to the objection and exception of counsel for the

state, J. M. Hiskey, the secretary and auditor of the Nevada Central Railroad Company, as a witness on its behalf, was allowed to testify that he had examined the books and vouchers of the company, and that for the calendar year 1901 the expenses from operation were $38,372.28, the earnings from operation $37,737.29, the loss from operation $634.99, and that, in addition to this loss, the company paid $953.03 for taxes on its personal property for that year. Counsel for the defendant asked the witness if the company were not liable for the amount of taxes that the jury would assess in this case. The objection to this question was sustained. We quote from the record an important part of the examination of A. J. Maestretti, a witness for the state, regarding the income and expenses of the road:

"Q. Have you examined the books of the Nevada Central Railroad Company for 1901? A. I have. Q. What is the result? Mr. Street: One moment; I desire to examine the witness as to his qualification as an expert accountant. Q. You have never kept books for a mercantile firm? A. I have not. Q. You never had any practical experience in bookkeeping, did you? A. No, sir. Q. You took a course in Heald's Business College, did you? A. Yes, sir. Q. In that course, did you have any instruction whatever in railroad bookkeeping? A. Yes, sir; the course was designed to cover all branches of commercial and business bookkeeping. Q. Respecting the result of your examination of the books of the Nevada Central Railroad Company for 1901, I will ask you to state now if you included in this result all actual receipts of the Nevada Central Railroad Company for that year? Mr. Mayenbaum: I object. That question is entirely improper. Mr. Street: We desire to show by this witness that in the result which he is now called upon to testify about that he included fictitious receipts of money or sums which were never received by the Nevada Central Railroad Company at any time, or at all. We desire also to show that he did not include in the result actual expenses paid out by the Nevada Central Railroad Company during the year 1901, but used his own judgment in excluding items of expense which were actually paid in the year 1901 by the Nevada

Central Railroad Company in the operation of its railroad, and we ask to examine the witness on this matter before he testifies to the result, for the reason, if our information is correct, the result would not be what is contemplated by the law, or competent in this case under any circumstances. Court: The question is not permitted. Mr. Street: We desire to note an exception to the ruling of the court on the ground that we have offered to show that this result about which the witness is asked to testify, and by the witness himself, included absolutely fictitious items of receipts never received by the Nevada Railroad Company in 1901, and in this result the witness did not include actual expenses of the Nevada Central Railroad Company incurred in its operation in the year 1901. Mr. Mayenbaum: You have stated that you examined the books of the company for 1901. I want you to tell me and tell the court and the jury what are the net earnings of that company in the operation of their railroad in Lander County for the year 1901. Just state to me the figures that you have arrived at as profits of the company for that year, and nothing else. Mr. Street: We desire to object, and make the same objection and exception as to the preceding question, and, further, this question does not show that it is any result of the entire books and figures of the Nevada Central Railroad Company respecting the matter inquired of for 1901. Mr. Mayenbaum: I mean the result of the entire books of the company. Mr. Street: We repeat our previous objection and exception, with the permission of the court. A. The result of my investigation shows that the Nevada Central Railroad Company should have made a profit of $10,645.28 for the year 1901. Mr. Street: We object, on the ground that the witness is not testifying as an expert. Court: The objection is overruled. Mr. Street: We take an exception on the ground stated in the objection. I also desire to add that he has not testified as an expert on the actual result of the books of the company, and we move to strike out the answer of the witness on the ground that it is incompetent, and does not come within the provision of the statute. Court: The motion is overruled. Mr. Street: We note an exception on the same ground."

Cross-examination by Mr. Street: "Mr. Street: You did include. in your computation from which you figure this result a lot of items for receipts you knew never were actually received by the Nevada Central Railroad Company? A. No, sir. Q. Will you state to the court or jury that you included nothing in the receipts you figured up except items of actual receipts—that means money actually received? A. I included only what was shown by the books and papers of the company which I examined. Q. Will you please answer my question clearly? A. There is one item which does not show actual cash receipts. Q. What is that item? A. It is a record of passes issued by the Nevada Central Railroad Company and used by the persons to whom they were issued. Q. So that the result you have testified to includes fictitious receipts which were not actually received in cash by the Nevada Central Railroad Company, does it not? Mr. Mayenbaum: We object. He testified to the profits, and only profits, of the company of that year, and has no knowledge only that shown by the books. Court: The question can be answered. A. The item of passes is one of the items charged, and, if this is a fictitious receipt, then it does include fictitious receipts. Q. Then there was no receipt of money shown at all by the Nevada Central Railroad Company for this item on its books? A. No, sir. Q. In your computation you used your own judgment in rejecting, and did not include in your result, a considerable number of actual items of expense of operation of the Nevada Central Railroad Company for the year 1901? A. I rejected items charged in the Nevada Central Railroad Company's books as items of expense in operation. Q. So the result you are testifying to is not the actual expense and earnings of the Nevada Central Railroad Company, is it, for the year 1901? A. No, sir; it is not the expense as shown by their books. Q. You are a railroad man? A. No, sir. Q. Have you worked on a railroad? A. No, sir. Q. In a railroad office? A. No, sir. Q. In machine shops? A. No, sir. Q. Never had anything to do with buying railroad supplies? A. No, sir. Q. You are by profession a lawyer? A. Yes, sir. Q. And you were formerly district attorney of Lander County? A. Yes, sir;

and before that I was a rancher for years. Q. In this so-called result, did you figure any taxes of the Nevada Central Railroad Company for 1901? A. No, sir. Q. You took upon yourself to exclude a voucher for taxes that you found, did you not? A. If I encountered any, I excluded them. Q. Do you know of a voucher or expenditure of the Nevada Central Railroad Company of $953.03, paid November 30, 1901, by the Nevada Central Railroad Company, to T. H. Dalton, treasurer and tax receiver of Lander County, Nevada, for taxes on its item of personal property and certain land at Clifton, also its engines and cars? A. Yes, sir; I know of such a voucher. Q. And you did not include that in your result, did you? A. No, sir. Mr. Street: I desire to move to strike out the answer of the witness in his direct examination as to the result of his examination concerning the net earnings of the Nevada Central Railroad Company of 1901, for it is shown now conclusively by his own testimony that this result is not any result of the actual showing upon the books of the company at all; that the witness in reaching this result took upon himself the province of all the issues in this case, taking the province of the jury; and it is now shown conclusively that fictitious items of receipts were computed by him to reach his result. It is further shown that he purposely excluded actual items of expense actually paid by the Nevada Central Railroad Company in 1901, and the so-called result cannot be permitted to go to the jury in this case. Court: The motion is denied. Mr. Street: We desire an exception on all the grounds stated in the motion. We desire to have it explicitly understood that we do not waive any exceptions heretofore taken or objections heretofore made to the testimony of this witness, and we desire our objections to go to all of his testimony."

*Trenmor Coffin* and *John A. Street*, for Appellants:

I. Certain primary questions arise upon the record on appeal which under the previous decisions of this court should in any event conclusively prevent the recovery by the plaintiff in the action of more than taxes at the lawful rate upon a valuation of the property in question of $50,944,

being the value of said property admitted by the defendant's answer. These questions relate to the insufficiency of the evidence to justify the verdict and judgment, and that the verdict is against law, and are fully set forth in the statement (Tr. 133 to 136), but for convenience we restate them in our argument:

"First.   *   *   *   The undisputed evidence admitted at the trial discloses that the defendant, the Nevada Central Railroad Company, suffered a financial loss in the actual operation of its railroad (situated wholly in Lander County, Nevada) for the year 1901, and no competent evidence was introduced tending to show that the railroad was not prudently and economically managed during said year, and the undisputed evidence showed that the prospective earnings of the railroad would not only probably not increase, but might seriously decrease, and uncontradicted evidence showed that the removable value of the property in question in this action was only $41,135.72, therefore the verdict as to the value for assessment of the 93 miles of main track could not lawfully exceed the sum of $50,944 admitted in defendant's answer, whereas the verdict and the judgment entered thereon fix a valuation of $158,100, being the assessed value, which is greatly above the 'full cash value' of the property for taxation purposes and is out of proportion to and above the actual cash value of said property, as shown by all the competent evidence in the case."

(*a*) The question as to whether the railroad company "suffered a financial loss in the actual operation of its railroad" for the year 1901 cannot fairly be disputed, although a very strange line of testimony was introduced by plaintiff in the court below in an endeavor to rebut the evidence of defendant which had shown the actual loss (from operation, including personal property, taxes on rolling stock, etc., and excluding any part of the taxes involved in this suit) to have been $1,545.70. This loss will be increased by the sum this court shall find due from defendant for its lawful taxes on the road-bed, etc., involved in this suit.

Error is assigned upon all of the testimony introduced by plaintiff upon this question, and we will discuss as a prelim-

inary matter assigned errors 11 to 15, inclusive, which relate to this subject.

(*b*) Errors No. 11 and No. 12 are assigned because the trial court refused to permit defendant upon its examination on the *voir dire* of A. J. Maestretti, a witness for plaintiff in rebuttal, to adduce the certain facts which counsel for defendant offered to show by the witness himself which would have disclosed that the evidence to which the witness was asked to testify was not competent, and highly prejudicial to the defendant.

Section 3522, Comp. Laws, provides: "There shall be no evidence of the contents of a writing other than the writing itself, except in the following cases: * * * Fifth—When the original consists of numerous accounts or other documents which cannot be examined in court without great loss of time and the evidence sought from them is only the general result of the whole."

The witness, A. J. Maestretti, testified that he had examined the books of the Nevada Central Railroad Company for 1901, and was asked: "What is the result?" Then, after the witness testified to having taken a course in bookkeeping in a business college, counsel for defendant, desiring to show that the requirements of section 3522, above quoted, had not been complied with by the witness, asked whether the witness had included in the "result" to which he was asked to testify "all actual receipts of the Nevada Central Railroad Company for 1901." (Tr. 78.) Objection was made to the question, and counsel then made the following statement: "Mr. Street: We desire to show by this witness that in the result about which he is now called upon to testify he included fictitious receipts of money or sums which were never received by the Nevada Central Railroad Company at any time, or at all. We desire to show also that he did not include in the result actual expenses paid out by the Nevada Central Railroad Company during the year 1901, but used his own judgment in excluding items of expense which were actually paid in the year 1901 by the Nevada Central Railroad Company in the operation of its railroad, and we ask to examine the witness on this matter before he testifies to the result, for the reason,

if our information is correct, the result would not be what is contemplated by the law, or competent in this case under any circumstances." The court refused to permit the questions, to which rulings defendant duly excepted. It must be clear without argument that the court erred in refusing to permit the defendant to examine the witness upon the matters it offered to show by him.

II. The subsequent examination of the witness proved the advisability of our request to be permitted to examine him as hereinbefore stated, for errors Nos. 13, 14, and 15 relate to the refusal of the court to strike out the evidence of the said witness, as follows: "The result of my investigation shows that the Nevada Central Railroad Company should have made a profit of $10,645.28 for the year 1901." An immediate motion was made to strike out this evidence upon the grounds that it was not responsive to the question and that the witness had not testified as an expert on the actual result of the books of the company, and that the answer of the witness was incompetent and did not come within the provisions of the statute.

III. It should be specially noted that there was no attempt to show by any competent witness that any item of expense of operation of the railroad whatsoever was unreasonable, or extravagantly or improperly made. Under the rule laid down in this court in a similar case the presumption is, in the absence of any showing to the contrary, that the owners of the railroad operated it to their own best advantage and that they obtained all the income possible and kept the expenses of operation as low as possible. (*State* v. *V. & T. R. R. Co.*, 23 Nev. 283.)

IV. "If the road does not pay current expenses and cannot be expected to do so, then it is worth no more than the value of its movable material less the cost of taking it up and getting it to market." (*State* v. *C. P. R. R. Co.*, 10 Nev. 74, affirmed in *State* v. *V. & T. R. R. Co.*, 23 Nev. 294.) The question under the Nevada statute is: "What amount would the property be appraised at, if taken in payment of a just debt due from a solvent debtor?" (Comp. Laws, 1082.) The statute requires the assessment at the "true cash value." (Id. 1084.)

V.   The railroad having been operated at a considerable loss, including taxes (which would necessarily be considered), and there being no showing for profits in the future, and it being assumed, as it must be, that a "solvent debtor" could pay his debt in cash, and a creditor therefore would not be obliged to take the railroad in order to save himself, it must be clear beyond controversy that upon the showing in this case the net amount in cash which could be realized for the movable material would be the only appraisement which could be placed upon it, if it was "taken in payment of a just debt due from a solvent debtor." It could not be appraised as a paying investment, that is, upon the rate of interest the profits would earn upon a capital sum, because there were no "profits" to be considered. In order not to "send good money after bad" the creditor of a solvent debtor could look only to stoppage of operation and to selling the movable material.

VI.   The tax levy was illegal and the tax proceedings void. In the case of *State* v. *Nevada Central Railroad Company*, 26 Nev. 357, in ruling upon a question similar, in some respects, to that now under discussion, this court held that "to successfully attack the tax levy defendant should have introduced the proceedings of the board in making it and specifically pointed out its illegal features and fatal defects." In the case at bar this rule was followed precisely. The proceedings of the board of county commissioners showed that it was ordered that "the rate of taxes for the year 1901, beginning January 1, 1901, be and they are hereby apportioned and shall be paid into the several funds of the county treasury of Lander County, State of Nevada, as follows, to wit: On each $100 of taxable property, including the proceeds of all mines and mining claims, within the county of Lander not exempt by law shall be paid into the state fund $1, general fund $1.12, railroad fund 70 cents, school fund 38 cents, hospital fund 35 cents, contingent fund 10 cents; total, $3.65." Aside from road taxes this is the entire record respecting the levy of county taxes. The state tax was afterwards reduced to 80 cents to conform with existing laws. The statutory provisions governing the levy of these taxes are found in

Comp. Laws, 1078, 1222, 1223, 2137.   The defendant argued
at length before the trial judge and fully set forth its claims
respecting the levy, said instructions raising the following
questions:  (1) The levy being in excess of the lawful rate
and the general and special taxes being commingled in one
gross sum upon the assessment roll, was not the whole levy
illegal and void, as stated in defendant's requested instruc-
tion No. 1?   (2) If for any reason the first question is not
affirmatively sustained, then was not the levy for general pur-
poses at $1.12 and the levy for "hospital fund" at 35 cents
illegal and void as to the whole levy for each of said purposes
or illegal and void as to the excess?   (See requested instruc-
tion No. 2.)   The court below refused to instruct as requested,
and exceptions to its refusal were duly entered and preserved.
The charge is entirely silent upon the subject.   The great
weight of authority is that "all statutes are mandatory which
expressly or by implication limit the amount of taxes which
may be levied, and where the limit fixed by law is exceeded
by a sum which is spread upon the whole roll [as in the case
at bar] the whole levy is void."   (1 Cooley on Taxation, 3d
ed. 1903, p. 589; *Wattles* v. *Lapeer*, 40 Mich. 624–627; *Boyce*
v. *Sebring*, 66 Mich. 210; *Kemper* v. *McClelland's Lessee*, 19
Ohio, 308–327; *Gerry* v. *Stoneham*, 83 Mass. (1 Allen) 319;
*Huse* v. *Merriam*, 2 Greenl. 375–6; *Drew* v. *Davis*, 10 Vt. 506.)

VII.   Concluding upon this branch of the case, we con-
tend that the assessment roll upon which all the taxes in
question were blended in one sum was wholly invalidated by
the inclusion of illegally levied taxes, and being so invali-
dated the plaintiff had no standing in court whatsoever under
its complaint.   The action being brought to enforce not only
the illegal taxes by sale of the property of the defendant,
but to assess severe penalties for the non-payment of illegal
tax, the complaint ought to be dismissed.   (*Boyce* v. *Sebring*,
66 Mich. 210.)

VIII.   The trial court refused to instruct the jury as
requested by defendant that, in ascertaining the net income,
if any, by the railroad company for the year 1901, or the net
loss, if any, the jurors should add any taxes actually paid by
the company for that year to the other necessary expenditures

of the road and deduct the same from the receipts of that
year, and, in order to determine whether there would be any
net income whatsoever, or to determine the loss, the jurors
should consider and deduct such an amount for the taxes for
1901 as they should agree ought to be paid by the railroad
company upon the property involved in this suit.   (Defend-
ant's requested instruction No. 7.)   See *State* v. *V. & T. R. R.
Co.*, 23 Nev. 297.   In *State* v. *Nevada Central R. R. Co.*, 26
Nev. 357, also a case like that at bar, the court said:   "From
$17,090 profits, $6,554.25 should be deducted for taxes for
the year."   No other rule would receive the sanction of any
thinking man because when the state, through its taxing
power, makes that which it taxes unprofitable it destroys its
value as an investment and is equitably estopped to say that
the taxes are not to be considered in determining the value
of the property as an investment, and yet the trial court
refused to give the defendant any benefit of the rule.   The
error is most manifest.

IX.   Error is also assigned for the refusal of the court to
give defendant's requested instruction No. 9:   "You are also
instructed in this case that the board of county commission-
ers having levied taxes in excess of the amount which could
lawfully be levied and the tax collector having attempted to
collect excessive taxes from the defendant, it had the lawful
right to resist the attempted collection of the excessive taxes,
and that you must not include in your verdict any penalties
whatsoever."   The county of Lander attempted to levy taxes
at an excessive rate and the defendant cannot be held bound
to pay illegally levied taxes.   It can defend against any
attempt to enforce against its property any illegal tax, and
under the provisions of the constitutions of the United States
and of the State of Nevada it has the inalienable right to
protect and defend its property against any attempt to take
it "without due process of law," which would be the result
if it could be taken for illegal taxes.   (Const. of U. S.,
amendment XIV; Const. of Nevada, art. I, secs. 1 and 2.)

X.   The true cash value of the property (*i. e.*, railroad)—
its value for taxation—should be determined by the same
matters that would be considered by one who wished to pur-

chase and was simply endeavoring to ascertain what the road was worth. The presumption being that the owners of the road will operate it to their own best advantage, the presumption extends to the profits or losses of previous years shown by the regularly kept books of the railroad, and an investor would consider these balances as showing the true results of the business.

XI. There was no evidence at all that the management of the railroad in 1901 was not reasonably economical and prudent, and the presumption must be that it was, as no item of expenditure was questioned, therefore there was no foundation for the modification made by the court of the instruction asked for by defendant, but denied by the court except as modified, relative to the management of the affairs of the road. The court in its instruction respecting the measure of damages in the case wholly failed to give the proper rule. The instruction gave no basis whatever upon which to compute a verdict if the jury believed the valuation of the property in the assessment roll to be excessive.

XII. We submit in good faith, as a vital point to the entire case of the plaintiff, that blending and lumping of invalid levies with lawful levies in one gross sum upon the assessment roll made the whole levy void and should prevent plaintiff from having any relief in this action, and its complaint should be dismissed with costs to defendant.

*James G. Sweeney*, Attorney-General, *H. E. Driscoll*, District Attorney, and *Henry Mayenbaum*, for Respondent:

I. George Watt testified that in 1900–1901 he was sheriff; that in 1900 he offered to give $200,000 for the railroad; that he was ready to pay that; that J. A. Miller, the banker, authorized him to offer that amount in cash; that the offer was made to A. C. Luck, manager of the Nevada Central Railroad Company; that at the meeting of the board of equalization in September, 1900, A. T. Maestretti, the chairman of the board, offered the same amount to the said manager. J. A. Miller also testified that he made the same offer to the manager. The offers were not accepted. After all the testimony of George Watt was given without objection in relation

to the offer to buy the railroad for $200,000 by Banker Miller in the year 1900, the defendant moved to strike it out on the ground that it does not refer to the year 1901. The court refused to strike it out and defendant excepted thereto on the ground stated. The defendant's assignment of error is thus: The court erred in denying the motion of defendant to strike out the evidence of George Watt respecting an alleged offer to buy the Nevada Central Railroad in the year 1900, the motion having been made upon the ground that the evidence did not refer to the year 1901. But now the counsel contends in his brief that said evidence is not competent to prove the "true cash value." No such ground was stated. The law is well settled that the objection to evidence must state the grounds of objection. The evidence is deemed consented to upon every ground not stated. The party objecting is bound by the ground stated at the trial, and he cannot on motion for new trial or on appeal rely on any other ground. (*McGurn* v. *McInnis*, 24 Nev. 370; *Sharon* v. *Minnock*, 6 Nev. 377; *Lightle* v. *Berning*, 15 Nev. 389; *McNamee* v. *Nesbitt*, 24 Nev. 400.)

II. The delinquent list proves everything necessary to sustain the tax, and whatever may be necessary to in any way affect this *prima facie* case of the state must be proved by the taxpayer to the satisfaction of the jury. Therefore, for the defendants to say that a fact necessary to be proved to affect this *prima facie* case is not proved, is the same as confessing that the defendants failed to prove such fact necessary to their defense. If there is no evidence on the part of a defendant in a tax suit, the jury must find their verdict for the state, upon the delinquent list alone, and no other evidence or testimony is required for the state to recover. After the introduction in evidence of the delinquent list, the defendants have the *onus probandi* throughout.

III. It is contended that the tax levy is wholly void, and therefore the taxpayers are not bound to pay any part of the taxes assessed against them on the ground "that the total levy for county purposes, exclusive of special taxes, is $1.57 on each $100, and that the levy could not exceed $1.50; and therefore the levy was 7 cents in excess of what the law

allows, citing section 150, revenue act, 1222 Comp. Laws, and that there was apportioned to the general county fund $1.12, but that the law allows only $1, and therefore this apportionment was 12 cents in excess of what the law allows, and that there was apportioned to the hospital or sick fund 35 cents, but the law allows only 25 cents, and therefore was 10 cents in excess of what the law allows, citing 2137 Comp. Laws." The distribution to particular funds is no part of the levy and cannot be questioned by the defendant.

By section 2 of the revenue act, Comp. Laws, 1078 (Stats. 1891, p. 135), the county commissioners are required, on or before the first Monday in March of each year to fix the rate of county taxes for such year, designating the number of cents on each $100 of property levied for each fund. Under this statute the amount of the county tax levied by the board of commissioners is to be apportioned to the different funds, but the proportion or number of cents to each fund is not provided by this statute or anywhere in the revenue act. That is entirely left to the county commissioners.

But it is contended that by section 2137, Comp. Laws, the commissioners are required to apportion all the moneys coming into the county treasury, except so much thereof as is not by law set aside into special funds, as follows: Two-thirds shall go into the general county fund, and one-sixth, or so much thereof as may be necessary, shall go into the indigent fund, and one-sixth, or so much thereof as may be necessary, shall go into the contingent fund. This is not in the revenue act, but in the act entitled "An act authorizing the board of county commissioners of the several counties of this state to apportion the county revenues." (Comp. Laws, 2137.) This act is simply for the regulation of the county business, and is no part of the revenue act. It does not pre-scribe or limit the levy or the amount to be levied, and the taxpayer cannot avoid the payment of his taxes on the pre-tense that the amount of the levy is not properly apportioned into the different funds. Nowhere is it provided that the levy shall be void, in whole or in part, if such apportionment of the levy is not made. The amount of the levy, therefore,

prescribed in the revenue act, is one thing, and the apportionment of it under section 2137, Comp. Laws, is another thing. The amount of the levy must be first determined by the commissioners under the revenue laws before they can apportion that amount to the different funds under the subsequent law regulating the disposition of all the county funds. The liability of the defendant for the taxes was fixed when the levy was made and the lien fixed.

It is perfectly plain that the matter of distribution or apportioning the county money is entirely in the power and discretion of the commissioners, for Comp. Laws, 2167, provides: "The county commissioners are authorized to transfer any surplus which may be in any of the county funds (except the school fund) from any one or more of said funds to another, or others, and transfer the same back to the fund or funds from which said surplus money was taken at such times and in such manner as in the judgment of the commissioners the best interests of the county may require." The delinquent list *prima facie* proves that the levy was duly made, and therefore that the commissioners had properly apportioned the funds and had subsequently reapportioned the same.

IV. By section 1118, Comp. Laws, the delinquent list is *prima facie* evidence to prove the assessment, property assessed, the delinquency, the amount of taxes due and unpaid, and that all the forms of law in relation to the assessment and levy of such taxes have been complied with. This *prima facie* evidence must stand until it is overthrown by proof to the contrary convincing to the jury. It is no concern of the taxpayer whether the commissioners or the treasurer or the tax collector, or all or any of them, apportioned the money. The state, by the delinquent list, proved that the levy was duly made, and the presumption is that the commissioners performed their duty, and that if there is any law authorizing the levy, it is conclusive that they made the levy by authority of such law, and if there is any condition of facts whereby such law is claimed to be invalid or inapplicable, such facts must be proven to the satisfaction of the jury by the party attacking the legality of such levy.

V.   It is not material whether section 1222, Comp. Laws, or the amendment of 1899 (Stats. 1899, 33) is in force, because under either the levy is good and is within the limits of either.   Still, it seems the amendment supersedes entirely the original statute, notwithstanding the amendment is made applicable only to certain counties having a certain number of votes.   (Sec. 150, Revenue Laws, replaced by the amendment.)   The law of constitutional and statutory construction is firmly established that an amendment of a statute replaces entirely the old statute.   There is but one section 150 of the revenue laws.   There cannot be two sections of 150 in the same statute.   A section amended must be reënacted and published in full and the amendment operates as a repeal of all the section amended.   The amendment *ipso facto* repeals the statute amended.   It is substituted for it.   Art. IV, sec. 17, of our constitution provides that the section amended shall be reënacted and published at length.   The amendment of a statute declaring that it shall be "as follows," repeals all the provisions not retained in the amendment.   The enacting clause of the améndment (Stats. 1889, 33) is thus: "Section 150 of said act [1222] is hereby amended so as to read as follows:".

In *People* v. *Montgomery*, 67 N. Y. 109, the court says: "The amended statute operates as if it had always been in the amended form."

*Trenmor Coffin* and *John A. Street*, for Appellants, in reply:

I.   Upon this appeal the sufficiency of the evidence to justify the verdict is directly before the court, and upon the subject of "offer to buy," discussed in respondent's brief, we refer the court to our argument in the original brief which establishes by highest and practically unanimous authorities that such evidence cannot be considered as in any way competent or sufficient to prove the "true cash value."   The evidence must be disregarded upon the question of value and is itself of no other weight in the case.   It required crossexamination to develop the true character of the evidence, but upon the question of the insufficiency of the evidence to

justify the verdict this court is untrammeled in placing the true evidential value upon each and every kind of testimony in the case. The inquiry is whether, taking all competent evidence into account, it is sufficient to justify the verdict, and it is not, as counsel seems to argue, conclusive upon this court that incompetent evidence, the evidential value of which is naught, was introduced. The question upon this particular point is not one of admission of evidence; it is one of sufficiency of evidence, which the court will see is entirely different from the point attempted to be argued by respondent. That the able counsel does not cite a single authority upon the question of the evidence being incompetent to prove "true cash value" illustrates the universality of the rule against his contentions.

II. The sixth point argued in respondent's brief (p. 12, *et seq.*) headed "Sufficiency of Testimony," repeats the mistaken idea already discussed that the delinquent list disputes or contradicts or affects the credibility of the testimony of defendant's witnesses. The only *prima facie* force of the delinquent list is that prescribed by law, and of course a statute in derogation of the ordinary rules of evidence will be confined strictly to its exact terms. (Sutherland Statutory Construction, sec. 333.) Section 1118, Comp. Laws, provides: "The said delinquent list, or a copy thereof, certified by the county auditor, and showing unpaid taxes against any person or property, shall be *prima facie* evidence in any court to prove the assessment, property assessed, the delinquency, the amount of taxes due and unpaid, and that all forms of law in relation to the assessment and levy of such taxes have been complied with." This means, and means only, that the list makes *prima facie* proof that the property involved in this action was assessed at the sum stated in the list; that the taxes were not paid by defendant and were delinquent in the amount stated in the list, and that the technical proceedings respecting the assessment and levy were complied with. This made the *prima facie* case of the plaintiff, but the statute also expressly provides that the taxpayer may rebut this *prima facie* proof by evidence tending to show "that the assessment is out of proportion to and above the actual cash

value of the property assessed" (Comp. Laws, 1124), and the defendant's evidence showing that such was the case is not rebutted in any particular. Our original brief shows this plainly. When the defendant proved facts from which the conclusion was irresistible that the assessment was actually· out of proportion to and above the actual cash value of the property, the burden was shifted to plaintiff to rebut the defendant's proofs, which it wholly failed to do.

III. The "current rate of interest" is not material, because it relates wholly in .railroad taxation cases to the class° of cases where the railroad earns a profit and not to cases where it suffers a loss upon its year's business. If the railroad earns a profit, then its value to an investor or a creditor of a solvent debtor is based on the net profits capitalized at the current rate of interest, but, if it does not earn any profit, that test does not apply, the test then being the value of its movable property. (*State* v. *C. P. R. R. Co.*, 10 Nev. 74; *State* v. *V. & T. R. R. Co.*, 23 Nev. 294.)

IV. Is the act of March 4, 1899, attempting to amend section 150 of the revenue act unconstitutional and void? Section 20 of article IV, Constitution of Nevada, provides: "The legislature shall not pass local or special laws in any of the following enumerated cases: * * * For the assessment and collection of taxes for state, county, and township purposes." Section 21, article IV, also provides: "In all cases enumerated in the preceding section, and in all other cases where a general law can be made applicable, all laws shall be general and of uniform operation throughout the state." As the amendment in question stands, it is made to apply to special counties only. As we recall it, it actually applies to only two counties of the state. On its face it evidences the fact that it was intended to be local and special. It is not a general act because it says it is not, and it is a local and special act because its language expressly restricts its operation to certain localities and to the people of special counties. It is not of uniform operation throughout the state and therefore violates section 21. The legal logic of a comparatively recent decision of this court is directly in point and the general rules of constitutional construction

are entirely against the validity of such an act. (*Schweiss* v. *District Court*, 23 Nev. 266; Sutherland on Statutory Construction, secs. 118, 128.) "Existing general laws required to have an uniform operation cannot be amended so as to interrupt their uniform operation." (Sutherland Statutory Construction, sec. 130, and cases cited.) Therefore section 1222 (sec. 150 of the revenue act) is in full force and unaffected by the attempted amendment of Stats. 1899, 33.

V. · Having the actual proceedings of levy, any *prima facie* evidential value of the delinquent list gives way to the actual facts, and the levy must stand or fall upon its own merits. The actual proceedings disclose that no levy was made for the purpose of paying any indebtedness for liabilities contracted prior to January 1, 1901. There is no recital of any such indebtedness and no pretense of making a levy to pay any such indebtedness. Therefore, the levy of $1.57 for county purposes cannot be validated by any presumption arising out of the delinquent list. In conclusion, we submit that the respondent has wholly failed to distinguish this case from the authorities cited and quoted in our original brief, and justice requires a reversal of the case. It must be most apparent that there was a gross overvaluation of this railroad, which it is undisputed is a losing investment, and it must also be apparent that the county board levied excessive taxes.

By the Court, TALBOT, J. (after stating the facts):

In order that a clearer understanding may be had of the essential facts, we have detailed important parts of the testimony relating to the main issue in the case—the true cash value of the road in 1901. It not being shown or contended that the prospective is greater than the present value, it depends largely upon the amount of earnings and expenses of operation. Following decisions in other states, this court long ago laid down the rule that the cash value of a railroad for the purposes of taxation—which means the amount at which the property would be appraised if taken in payment of a just debt from a solvent debtor—must be determined mainly by its net earnings, capitalized at the current rate of

interest, taking into consideration any immediate prospect of an increase or decrease in its earning capacity. The actual cost of the road may be shown, for, *prima facie*, that is the value. But if it appears that the actual cost was in excess of the necessary cost, the necessary cost is the proper standard. If it further appears that the net income of the road does not amount to current rates of interest on its necessary cost, and is not likely to do so; or if, in short, the utility of the road is not equal to its cost, then its value is less than its cost, and must be determined by its utility alone. If the road does not pay current expenses, and cannot be expected to do so, then it is worth no more than the value of its movable material, less the cost of taking it up and getting it to market. (*State* v. *C. P. R. R. Co.*, 10 Nev. 74; *State* v. *V. & T. R. R. Co.*, 23 Nev. 295, 46 Pac. 723, 35 L. R. A. 759.) In the latter case it was said that railroads are bought and sold so seldom, and the value of each road depends so entirely upon its surroundings, that in determining the amount we must resort to principles other than those governing ordinary kinds of property which have a market value. It is apparent that a most important question here concerns the amount the road earns or ought to earn, and the necessary expenses of operation. As held by this court in *State* v. *V. & T. R. R. Co.*, 24 Nev. 80, 49 Pac. 945, 50 Pac. 607, the net income of a railroad, when necessary to be determined for the purposes of taxation, is the difference between the gross receipts and necessary expense under reasonably economical and prudent management. The gross receipts to be considered for this purpose are not necessarily those in fact received, but such receipts as would be received under a reasonably economical and prudent management; and the expenses to be deducted in order to determine the net income are not necessarily the expenses which were in fact incurred, but such expenses as would be incurred under a reasonably economical and prudent management. It is earnestly claimed for the state that it was competent for the witness Maestretti to give the result of the items in defendant's books which he deemed properly chargeable as the expenses of operation, and for him to reject or

ignore in his answer other items that he did not consider so chargeable, and that he could give the amount that, in his judgment, the company ought to have earned beyond its actual receipts, and state the net amount that the company ought to have made that year. It is said in the brief that there are many things, such as a four-in-hand or the castle on the mountain at Austin, that even a stupid witness would know were not necessary in the operation of a railroad. For the defendant it is asserted that everything charged as expenses in its books is presumed to be necessary for its operation, and that the witness for the state could not give his conclusions which might overthrow this presumption. Are these contentions consistent with correct legal principles? If, as said by this court (23 Nev. 294, 46 Pac. 724, 35 L. R. A. 759), "it is reasonable to suppose that the owners of a road will operate it to their own best advantage; that they will obtain all the income possible, and keep the expenses of operation as low as possible," this does not raise any presumptions, further than is shown by the transactions themselves as originally entered, that moneys paid out and items charged in the books were necessary for the operation of the road. Classification to expense or other accounts is in the nature of a written declaration in a party's own favor, made without the sanctity of an oath or the opportunity of cross-examination. It is as natural to conclude that a railroad company will pay interest on its bonds and meet its fixed charges, if not also that it will lay betterments, as it is to believe that it will meet its operating expenses. If it were the rule of evidence that a binding or other presumption would attach in favor of a railroad company for any items it may classify or charge in its own behalf to operating expenses, the same self-interest which, in the absence of any contrary showing, may be presumed to result in an economical management, might prompt the charging of doubtful and uncertain items to the expense account if a suit for taxes were anticipated. Unless admitted without objection, the nature of the items should be shown, or at least lumped into different classifications, in order that the court may determine whether they are properly charge-

able as expense of operation.   (*Home Ins. Co.* v. *Baltimore Warehouse Co.*, 93 U. S. 527, 23 L. Ed. 868; Abbott's Trial Brief, Civil, 322.)   This need not result in much delay or difficulty.   Prior to the trial the accountant testifying may take the total of moneys received from fares, freights, or other sources, and classify and ascertain the amounts of the different kinds of expense, such as that shown by the pay roll for the usual employees of a road, for fuel, ties, and other material and supplies, which are admittedly or clearly necessary; and doubtful items can be separately listed or classified, and their amounts or totals brought to the attention of the court, and allowed to go to the jury or not, as the court, and not as the witness, may determine, unless a question of fact arise regarding the necessity for particular expenditures.

The error in allowing the answer of Mr. Maestretti giving his result regarding the net earnings to stand after he stated that he included such items as he deemed proper and rejected others which he thought improper is well illustrated by his failure to include the taxes as part of the operating expenses. It was equivalent to permitting the witness to tell the jury that the taxes ought not to be allowed as a part of the charges of operation for the year—a matter of law for the trial judge, and one previously determined by this court contrary to the opinion of the witness.   The objection on the ground that it was a matter of law was promptly and properly sustained to the question put to Mr. Hiskey as to whether the company was liable for the taxes that the jury might assess for the year 1901.   This witness was not permitted to testify for the defendant that the company was liable for its taxes, and, inferentially, that they were a necessary part of its expenses; but the witness for the state was permitted to give a result which, in effect, said to the jury that the taxes could not be allowed as part of the charges of operation.   He included as a part of the receipts which the company ought to have earned the amount in fares that would cover the distances traveled on passes.   Although these amounts should be included in determining what the earnings of the company ought to be unless the defendant showed that the passes were used by its

employees, or in connection with the business of the road, and if the company wishes to be generous and carry passengers or freight for less than schedule rates, the ordinary value of the service rendered would be allowed in the estimate of what the road ought to earn, whether they should be so considered was a question of law. The witness, as an accountant, could estimate and give the amounts or totals of those or other items specified or classified, and then it would be for the court to determine which of these should be considered by the jury.

As to what other items the witness included or rejected in arriving at his result we are not informed, nor were the district court or the jury further enlightened. No doubt many of the transactions shown by the books were properly placed in his estimate; but whether others were improperly so, whether he allowed items for expenses that ought to have been rejected, or rejected others that ought to have been allowed, as he did the payment by the company of the taxes on its personal property, and whether he classed as receipts anything that cannot be legally considered such, cannot be ascertained from his testimony or the record, because the items on which his result is based are not specified.

In this regard the testimony of Mr. Hiskey for the company is hardly more satisfactory. It is evident that his answer that the loss from operation that year was $634.99 was based either upon his judgment as to the items allowable or upon the way they had been classified in the books, neither of which, as we have said, should control the province of the court in determining which are for the consideration of the jury when objection is made. Notwithstanding the wide discrepancy in their respective results, the estimate of a loss by the witness for the defendant and that the company ought to have netted over $10,000 that year by the witness for the plaintiff, both may have been entirely correct in their additions, subtractions, and balances for which they had been called as expert accountants. So far as appears, they differed only in the items which they considered, and which were selected in the exercise of their judgment, instead of that of the court. If they had disagreed regarding the result or bal-

ances from the same transactions, or if there had been a con-
flict in their testimony pertaining to anything tangible, it
would have been for the jury to determine between them.
As it is, the testimony relating to the important issue in the
case is based upon the opinion of one witness for the state
and the different opinion of a witness for the defendant, or
the way the company classified its accounts, as to whether
the various items in defendant's books for that year were
legally allowable as receipts or expenses of operation—verily
a foundation more uncertain and less stable than the air
cushion that supports the abutment of the Brooklyn Bridge.
As said in *Hammersmith* v. *Avery*, 18 Nev. 229, 2 Pac. 55, the
law requires a party to establish his case by the best evidence
of which it is susceptible.   It is the first entries of trans-
actions in daybooks, journals, pay rolls, stubs, and books of
original entry, rather than the secondary entries, that make
them admissible; and subsequent classifications of these into
expense, ledger, or other accounts are not evidence in a
party's own favor, except as they are shown to be substan-
tiated by the original entries which control.   If the witness
had classified these, and given the totals and remainders
of the different groups, designating them by reference to
the books or to tabulations which he had made from the
books, the items from which he derived his results would
have been apparent and fixed; so that, if any of these were
in doubt, the court could determine in regard to their rele-
vancy, instead of leaving this judicial function to the wit-
ness.   Not only was it error to permit the witness to give
his opinion on questions of law, or, which was equivalent, a
result based more or less upon his judgment in allowing or
rejecting doubtful items, but it would have been improper
for him to testify regarding the necessity for other items
concerning which there was no doubt.   That conductors,
engineers, other ordinary employees, fuel, and ties were
necessary in the operation of the road was a matter of com-
mon knowledge, concerning which the court and jury did not
need the opinion of any witness.   The presumption would
arise that any money shown by the company's books to have
been expended for these or for other purposes generally con-

nected with the operation of a railroad were prudently and economically expended, but if the costs for building a castle or the payment of interest on bonds were charged in the expense account no presumption would arise from the fact that they were so charged that they ought to be deducted from the earnings in estimating the annual net income. They would show for themselves the contrary, and no witness should be permitted to testify that, in his judgment, they ought to be allowed or rejected. Matters of law and of common knowledge are directly for the court and jury. Every one knows that money expended for coal to generate steam to propel a locomotive and for the wages of an engineer is a legitimate charge in the operation of a railroad, and the presumption would arise that any money shown by the books to have been paid out for these purposes was a necessary expenditure. If it were sought to overthrow this presumption, witnesses possessing special knowledge or skill could be called to give their opinion that the amount of coal necessary for propelling trains, or the market price of coal, or the ordinary wages for such engineers, were less than the charges made.

The books were not placed in evidence on the trial in the district court, but, as each party sought to prove a result from them through the examination and opinion of an expert, and each objected to the opinion of the opposing witness without making any objection to the books themselves, it is apparent that their introduction was waived. Without consent or waiver, it would have been necessary to lay the usual foundation for their introduction by proving that they contained correct and original entries of the transactions made at the time they took place, or from permissive memoranda, before they, or evidence of their contents, could be received. To have secured their introduction, it would not have been necessary to prove that the various items scattered through daybooks or others of original entry had been carried to and properly classified in the expense or other accounts in the ledger, and such classification made by the defendant in its own behalf was not supported by any testimony as to its correctness, and was inadmissible, except so

far as shown to be relevant by the transactions or charges themselves as originally entered. The mere classifications made by the defendant, or the conclusion of witnesses as to which items were properly allowable, were insufficient and incompetent to overthrow the presumption in favor of the correctness of the assessment made by the assessor under official oath, and presumably without interest between the state and the defendant, or to overthrow the burden cast upon the defendant to prove its allegation of overvaluation. By the admission of the books or the waiver of their introduction only such original entries as are material to the issue are to be considered as affecting the result. Until the contrary was shown by proof, there would be a presumption that charges for anything essential to the operation of the road, such as coal, ties, and ordinary supplies, and wages for usual employees, represented reasonable and economical expenditures. When no dispute exists, and no objection is made, it may be convenient to allow expert accountants to state the net earnings as shown by the books, and this testimony could stand as effectually as parol evidence given of a conveyance of real property, or a written contract where no objection is made to the non-introduction of the writing. ( *Vietti* v. *Nesbitt*, 22 Nev. 397, 41 Pac. 151; *Watt* v. *N. C. R. R. Co.*, 23 Nev. 154, 44 Pac. 423, 46 Pac. 52, 62 Am. St. Rep. 772.) If it were desired to supply the testimony of experts as to whether certain doubtful items were necessary for the operation of the road, or were for betterments, fixed charges, or useless expenditures, they should have been specified, so that the court and jury could have properly considered them. The witness Maestretti did not claim to be an expert other than as an accountant, but, if it had been shown that he or the witness Hiskey were the most experienced and eminent of railroad managers, it still would have been incompetent for either of them, whether on behalf of the state or the defendant, both of which should be governed by the same rules that apply to other litigants, to give their opinions on matters of law, which are for the court, or regarding commonly known facts concerning which the court and jury could determine as well as they. The duty of the

accountant is to save the time of the court by striking totals and balances of such items as are relevant, but not to give his judgment as to what those items are without bringing them to the attention of the court. Section 427 of our practice act, being section 3522, Nev. Comp. Laws, is specific enough to exclude this opinion testimony. It provides that there shall be no evidence of the contents of a writing other than the writing itself, except: "First—When the original has been lost or destroyed; in which case proof of the loss or destruction shall first be made. Second—When the original is in the possession of the party against whom the evidence is offered, and he fails to produce it after reasonable notice. Third—When the original is a record or other document in the custody of a public officer, or officer of a corporation. Fourth—When the original has been recorded and a certified copy of the record is made evidence by statute. Fifth—When the original consists of numerous accounts or other documents which cannot be examined in court without great loss of time and the evidence sought by them is only the general result of the whole." The rule at common law, or in states without this statutory enactment, is the same. (1 Greenl. Ev. 93; *Burton* v. *Driggs*, 87 U. S. 136, 22 L. Ed. 299.) The words "only the general result of the whole" naturally limit the answer of the witness to the whole of the accounts and vouchers or to the whole of particular accounts, tabulations, or items that are specified, and do not indicate that he may use his judgment in rejecting part of these without designating them. In *State* v. *Rhoades*, 6 Nev. 376, this court held that it was proper to ask an expert who had investigated the accounts in the state treasurer's office: "What was the result of your examination as to the amount of money which should have been in the treasury on the 10th day of September, 1869?" In this question the word "should" had quite a different meaning and limitation than it had in the answer of the witness Maestretti. The amount that should have been in the state treasury was simply the difference shown by the books between all the receipts and all the disbursements, and did not imply that the witness was to exercise his judgment in excluding anything. It is

a well-established rule that the opinions of experts can-
not be received in regard to matters of inquiry that
may be presumed to lie within the experience and knowl-
edge of all men of average education moving in the ordi
nary walks of life. When the facts can be placed
before the jury, and they are of such a nature that jurors
generally are competent to form opinions and draw infer-
ences from them, then the opinions of experts are not admis-
sible. (Rogers' Expert Tes. 26; *Franklin Ins. Co.* v. *Gruver*,
100 Pa. 273; *White* v. *Ballou*, 8 Allen, 408; *Hovey* v. *Sawyer*,
5 Allen, 554; *Perkins* v. *Augusta Banking Co.*, 10 Gray, 312,
71 Am. Dec. 654; *Clark* v. *Fisher*, 1 Paige, 171, 19 Am. Dec.
402; *Monroe* v. *Lattin*, 25 Kan. 351, 354; *People* v. *Muller*,
96 N. Y. 408, 48 Am. Rep. 635; *Baltimore R. R. Co.* v. *Leon-
hardt*, 66 Md. 77, 78, 5 Atl. 346; *State* v. *Anderson*, 10 Or.
448; *New England Glass Co.* v. *Lovell*, 7 Cush. (Mass.) 319;
*Shafter* v. *Eveans*, 53 Cal. 32; *City of Chicago* v. *McGiven*, 78
Ill. 347; *Naughton* v. *Stagg*, 4 Mo. App. 271; *Cook* v. *State*,
24 N. J. Law, 843, 852; *Dillard* v. *State*, 58 Miss. 368; *Gavisk*
v. *Pacific R. R. Co.*, 49 Mo. 274; *Concord Railroad Co.* v.
*Greely*, 23 N. H. 237, 243; *Nashville R. R. Co.* v. *Carroll*, 53
Tenn. 347; *Linn* v. *Sigsbee*, 67 Ill. 75; *Veerhusen* v. *Chicago
R. R. Co.*, 53 Wis. 689, 694, 11 N. W. 433; 16 Cyc. 852; 3 Wig.
Ev. sec. 1918, and cases there cited.)

Judge Campbell, in *Evans* v. *People*, 12 Mich. 35, said:
"It is an elementary rule that, where the court or jury can
make their own deductions, they shall not be made by those
testifying." Lord Mansfield, in *Carter* v. *Boehm*, 3 Burr.
1905: "It is an opinion which, if rightly formed, could only
be drawn from the same premises from which the court and
jury were to determine the cause, and therefore it is improper
and irrelevant in the mouth of a witness." "It is a good gen-
eral rule that a witness is not to give his impressions, but to
state the facts from which he received them, and thus leave
the jury to draw their own conclusions; and wherever the
facts can be stated it is not to be departed from." (*Cornell*
v. *Green*, 10 Serg. & R. 16.) In *Campbell* v. *Rusch*, 9 Iowa,
337, it was said: "In answering this question the witness
was not communicating facts, but his own conclusions, drawn

from the language used in the written instrument. This was not permissible. It was the special duty of the jury under the instructions of the court to draw conclusions, and for the witness to state facts. The exceptions to the rule are to be found in these cases where a witness speaks of matters of science, trade, and a few others of the same character, but they cannot be extended to cases like the present." Again, in *Lime Rock Bank* v. *Hewitt*, 50 Me. 267, and Lawson's Ex. & Opin. Ev. 166: "It was wholly inadmissible for the witness to state his inferences and presumptions arising from what appeared upon the books. By the well-established rules of law these were for the jury."

The exception to the rule as provided by the statute and the decision lies in allowing the accountant to state the result of arithmetical calculations that could be made by the court. When accounts are numerous, the convenience and expedition of trials demand the admission of the testimony of competent witnesses who have perused the entire mass and will state summarily the net result. Regarding this there is a collation of decisions in 2 Wig. Ev. sec. 1230. In *Adams* v. *Board*, 37 Fla. 283, 20 South. 271, it was said: "The witness in answer to the question detailed at length divers facts that he asserted to be shown by the records examined by him. There was no error in excluding this evidence. The contents of records cannot be shown by parol where the record itself is extant and accessible." In *State* v. *Brady*, 100 Iowa, 191, 69 N. W. 290, 36 L. R. A. 693, 62 Am. St. Rep. 560, a tabulated statement prepared by an agent of railroad companies from the records showing the sales of tickets at a station during the year was held to have been properly admitted.

It was shown on the trial that an offer of $200,000 for the road had been made to the general manager in 1900 by residents of Austin, or that he was asked whether the company would sell it for that amount. The witnesses who testified that they made the offer did not have that amount of money, and did not make it with any ability or expectation of buying the road for themselves, but pursuant to a statement made by a man named J. F. Mitchell, who was not present

nor called as a witness, but who had previously said to J. A. Miller that "he had parties—good, responsible parties—to take it at $200,000." There was no proof that Mitchell or the others to whom he referred had this amount of money, or were able to buy the road, nor that they knew anything regarding its value, nor that the general manager or any one with authority in reply to the offer said anything in the nature of a declaration against interest. Objection and exception were made to testimony of the offer on the ground that it "did not tend to prove the value in 1901." Counsel for the state suggested that the exception is too narrow. It may have been intended to object only for the reason that the offer was made in 1900, instead of 1901; but it is stated more broadly as not tending to prove the value of the road in the latter year, the one in which it was essential to determine the valuation as a basis for the taxes sought to be recovered. If the offer were sufficient to prove the value of the road in 1900, in the absence of any contrary testimony that value would be presumed to continue during 1901. However, we believe that under the circumstances shown the offer was not sufficient to show the value in 1901, or at any other time, and that the objection ought to have been sustained. In *Hammersmith* v. *Avery*, 18 Nev. 229, 2 Pac. 55, it was said: "The evidence of the plaintiff as to the offer made him for the property should have been rejected, because, among other reasons, the person making the offer may not have known the value of the property;" and, quoting from *Fowler* v. *Comrs.*, 6 Allen, 96: "The value of an offer depends upon too many considerations to allow it to be used as a test of the worth of property." We do not wish to be understood as holding that cases may not arise in which it is permissible to prove an offer, or the declarations of a party in interest or authority in reply to one; but when, as here, it is not shown that the persons who made them had the means to meet them, or knowledge of the value of the property, we see no principle upon which they may be considered admissible. (*Sharp* v. *U. S.*, 191 U. S. 341, 24 Sup. Ct. 114, 48 L. Ed. 211, and other cases cited in appellants' brief.)

The district court erred in refusing defendant's instruction

No. 7, following: "You are instructed that in ascertaining the net income, if any, of the Nevada Central Railroad, for the year 1901, or the net loss, if any, you should add any taxes actually paid by the company for that year to the other necessary expenditures of the road and deduct the same from the receipts of the road for that year; and in order to determine whether there will be any net income whatsoever, or to determine the loss from operation of the road, if a loss is shown, you must consider and deduct from the receipts of the road for 1901 such an amount for the taxes for 1901 as you agree ought to be paid by the railroad company upon the property described in the complaint, which, in brief, consists of 93 miles of main railroad track and 2 miles of side track." It was held in *State* v. *V. & T. R. R. Co.*, 23 Nev. 297, 46 Pac. 723, 35 L. R. A. 759, that in determining the annual net income of a railroad the taxes should be deducted as a part of the expenses of operation. (*State* v. *Railroad Co.*, 26 Nev. 357, 68 Pac. 294, 69 Pac. 1042.) In compliance with this rule, the instruction ought to have been given. But in determining the value of the road on the basis of its earning capacity capitalized at current rates of interest it should be given the benefit of the payment of its taxes only once, so that in ascertaining what the current rates of interest are the net yield on other investments after the payment of taxes on them should be taken as a guide. For instance, there was proof on the trial that 6 per cent or 8 per cent was paid on mortgages in Lander County. If the tax on these was paid by the mortgagee, and not by the mortgagor, they would be properly deducted from the interest rate in arriving at the net yield of the investment and the true earning value of the money placed in such mortgages. It could be shown whether the income from investments other than government bonds, which command a lower rate by reason of exemption from taxation, would be reduced by the usual tax rate.

Exception was taken to the evidence introduced on behalf of the state that the articles of incorporation of the Nevada Central Railroad Company provided for 7,500 shares of stock of a par value of $100 a share, and that the company

had made a mortgage in 1888 for $750,000 on all its prop-
erty to the Central Trust Company of New York, and that
Lander County in 1879 issued $200,000 in bonds to aid the
building of the road.   As said before, a railroad is different
from ordinary property having a market value, and its cost
may be shown.   Under the circumstances the giving of the
mortgage was in the nature of an admission that the prop-
erty was worth the amount of the loan, and the value of the
corporate shares and the amount of the bonds issued by the
county to aid in the construction of the road had a tendency
to show that these sums were a part of its cost, for the same
presumption would attach that these moneys were economic-
ally used in its construction that prevails in regard to its
operation.   Presumably its cost is its value until the time
a lesser or different value is shown.   The presumption that
the road is worth its cost continues until it is shown that it
is less by reason of insufficient earning capacity to pay net
current rates of interest on its cost, or from other causes.

Defendant further contends that the levy of $1.57 for
county purposes on each $100 of valuation made the whole
levy void under the following provision of the revenue act:
"The board of county commissioners in each county of this
state are hereby authorized and empowered to levy annually,
on or before the first Monday in March, an *ad valorem* tax
for county purposes not exceeding the sum of two dollars on
each one hundred dollars value of taxable property in the
county and such special taxes as may be authorized and
required by law; *provided*, the total tax levy in any one year
for all purposes shall not exceed five dollars on each one
hundred dollars value of taxable property in any county or
part thereof; *provided*, no levy in excess of one dollar and
fifty cents on each one hundred dollars value of taxable
property therein shall be so levied in any county of this state
for county purposes unless the county is indebted for liabil-
ities contracted prior to January 1st next preceding the
making thereof and not bonded or funded."   It was not
shown that the county was not indebted for liabilities con-
tracted prior to 1901, and the presumption is in favor of
official action and the levy.   This makes it unnecessary to

determine whether such levy would have been invalid if it had been shown that no such prior indebtedness existed.

The defendant sought to have their witness Hiskey state the amount of the receipts and earnings of the road for the previous ten years, as shown by the balances standing on the books. The testimony was properly excluded, because the witness had not made the computations, and did not know whether they were correct, nor what items they included, and did not bring them under the rule we have hereinbefore stated.

When the case is tried again, the court can determine whether there is evidence to cover or warrant the modification to instruction No. 5. We have examined the other specifications treated in the elaborate and interesting briefs, but find no error in regard to them.

The cause is remanded for a new trial.